pd-0907-17
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/5/2018 1:09 PM
Accepted 3/7/2018 11:44 AM
DEANA WILLIAMSON
CLERK

No. PD-0907-17

RECEIVED
COURT OF CRIMINAL APPEALS
3/7/2018
DEANA WILLIAMSON, CLERK

# In the Court of Criminal Appeals of Texas

---

## CHRISTOPHER ERNEST BRAUGHTON, JR.,
### APPELLANT

### v.

## THE STATE OF TEXAS,
### APPELLEE.

---

On Petition for Review from the First Court of Appeals, No. 01-15-00393-CR

---

## *Amicus Curiae* Brief of the National Rifle Association of America, Inc., in Support of Appellant

---

David H. Thompson
John D. Ohlendorf
Haley N. Proctor
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9602 (fax)
dthompson@cooperkirk.com

LAW OFFICE OF BRADY WYATT, III
Brady Wyatt
State Bar (Texas) No. 24008313
3300 Oak Lawn, Suite 600
Dallas, Texas 75219
Phone: (214) 559-9115
Email: Attywyatt@hotmail.com

*Counsel for the National Rifle
Association of America, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

IDENTITY AND INTEREST OF AMICUS .........................................................................1

STATEMENT OF THE CASE ............................................................................................2

ISSUES PRESENTED........................................................................................................2

STATEMENT OF FACTS...................................................................................................2

ARGUMENT ...................................................................................................................4

    I.      No Rational Juror Could Have Found Against Christopher's
            Self-Defense Claim Beyond a Reasonable Doubt ..............................4

    II.     The Court of Appeals' Decision Threatens to Undermine the
            Right to Self-Defense ..........................................................................13

CONCLUSION AND PRAYER FOR RELIEF ....................................................................23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                       **Page**

*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) ...................................5, 11

*Dawkins v. State*, No. 08-13-00012-CR, -- S.W.3d --, 2016 WL 5957311 (Tex. App.–El Paso Oct. 14, 2016) ..............................................................................4

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...............................................13

*Elizondo v. State*, 487 S.W.3d 185 (Tex. Crim. App. 2016) .....................................5

*Hooper v. State*, 214 S.W.3d 9 (Tex. Crim. App. 2007) ...........................................6

*Jackson v. Virginia*, 443 U.S. 307 (1979)..............................................................4, 5

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...................................................20

*Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)................................5

*Temple v. State*, 390 S.W.3d 341 (Tex. Crim. App. 2013)....................................5, 6

**Constitutions and Statutes**

U.S. CONST. amend. II..............................................................................................13

TEX. CONST. art. I, § 23 ...........................................................................................13

TEX. GOV'T CODE § 411.172(a)(2) ..........................................................................22

**Other**

*Active License/Certified Instructor Counts as of December 31, 2016*, TEXAS DEPARTMENT OF PUBLIC SAFETY, https://goo.gl/GLNQNY ...............................22

Charles C. Branas, et al., *Investigating the link between gun possession and gun assault*, 99 AMER. J. PUB. HEALTH 1 (2009) .................................................19

H. Sterling Burnett, *Texas Concealed Handgun Carriers: Law-Abiding Public Benefactors*, NATIONAL CENTER FOR POLICY ANALYSIS (2000), https://goo.gl/mm4Roc ........................................................................................22

Philip J. Cook, et al., *Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041 (2009) ...........................20

*Conviction Rates for Handgun License Holders, Reporting Period: 01/01/2016–12/31/2016*, TEXAS DEPARTMENT OF PUBLIC SAFETY, https://goo.gl/uSxNse........................................................................................22

David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results from a National Survey*, 15 VIOLENCE & VICTIMS 257 (2000) ...................................................................................15

Don B. Kates & Gary Mauser, *Would Banning Firearms Reduce Murder and Suicide? A Review of International and Some Domestic Evidence*, 30 HARV. J. L. & PUB. POL'Y 649 (2007) .......................................................16

FIREARMS AND VIOLENCE: A CRITICAL REVIEW (Charles F. Wellford, John V. Pepper & Carol V. Petrie, eds. 2005)..............................................16, 20

GARY KLECK & DON B. KATES, JR., ARMED: NEW PERSPECTIVES ON GUN CONTROL (2001) ............................................................14, 15, 18, 19

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995)...................................................................................17

GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL (2006)...............................................................................14, 15, 17

NRA-ILA, *The Armed Citizen*, https://goo.gl/fGg6dX.............................................1

Lawrence Southwick, Jr., *Self-defense with guns: The consequences*, 28 J. CRIM. JUST. 351 (2000)..................................................................18

*Texas Population Projections Program*, TEXAS DEMOGRAPHIC CENTER, https://goo.gl/2K72LU ...................................................................22

Eugene Volokh, *"Guns Did Not Protect Those Who Possessed Them from Being Shot in an Assault,"* THE VOLOKH CONSPIRACY (Oct. 5, 2009), https://goo.gl/Gb46id ...................................................................19

JAMES D. WRIGHT & PETER H. ROSSI, ARMED AND CONSIDERED DANGEROUS (2d ed. 2008) ...................................................................21

## IDENTITY AND INTEREST OF AMICUS[1]

The National Rifle Association of America, Inc. (the "NRA") is America's foremost advocate of the Second Amendment, and it is the country's oldest civil rights organization. Today the NRA has more than five million members, and its educational programs, community service, and advocacy influence many millions more. The NRA is the leading provider of firearms marksmanship and safety training for law enforcement across the county—including in Harris County, Texas.

The NRA has a vital interest in this case. The right to defend oneself and one's family is a fundamental right that has been recognized repeatedly by the courts as a core component of the right to keep and bear arms and should not be infringed by any branch of government. The NRA's interest in responsible self-defense is apparent from its blog, "The Armed Citizen," in which the NRA publicizes instances of responsible gun owners who have defended themselves or others against burglars, robbers, and other violent criminals.[2] The NRA is also devoted to the practical implications of defending oneself or one's family.

Accordingly, the NRA has strong interests in this case.

---

[1] The NRA is solely responsible for paying any fee associated with the preparation of this brief.

[2] *See* NRA-ILA, *The Armed Citizen*, https://goo.gl/fGg6dX (last visited on Sept. 17, 2017).

## STATEMENT OF THE CASE

In this case, a young man who acted to protect his family from a violent attack faces a twenty-year prison sentence for murder. Like millions of Americans do each year, he exercised his fundamental right to bear arms in defense of himself and others. What is at stake in this case is not only his fate, but the fate of countless Texans who will be faced with serious or mortal peril, and who will make a choice between life or death in the shadow of this question: will their justified and therefore lawful use of force be subject to *rational* judgment by their peers? Because the decision below denies that guarantee, it demands immediate and decisive correction.

## ISSUES PRESENTED

*Amicus* adopts the issues presented in appellant's brief.

## STATEMENT OF FACTS[3]

On May 24, 2013, the complaining witness, Emmanuel Dominguez, and his girlfriend spent the afternoon and early evening at bars and taverns consuming alcohol. After a fight with his girlfriend, Dominguez left her alone at a bar and drove home, heavily intoxicated, on his motorcycle.

As Dominguez approached the house that he and his girlfriend rented, he encountered the Braughton family in their car. The Braughton family had been to

---

[3] The factual background is taken from the April 20, 2017 majority opinion and the dissenting opinion.

dinner, and appellant's father, mother, and younger brother were in the car. Revving his engine, Dominguez approached the family car so closely that he set off its proximity alarms.

The motorcycle accelerated and moved to the driver's side of the Braughton car, swerved toward the car, and then moved in front of the car and slammed on its brakes. Mrs. Braughton, terrified by the ongoing events, called her son Christopher, appellant, who had stayed at home while the rest of the family went to dinner. Mrs. Braughton told her son that they were being chased and that she was scared.

In response, Christopher went to his parents' room and retrieved his 9-milimeter handgun. He loaded the gun and went outside with the gun pointed in a safe direction. When he got outside he saw Dominguez, a retiring Marine, punching his father in the face and "beating him up" while his father—who was unarmed—tried to defend himself. Christopher yelled several times "Stop, I have a gun." According to Christopher, Dominguez responded, "Oh, you have a gun, m_____ f_____. I have a gun for you," and then reached into the saddlebag on his toppled-over motorcycle. Christopher then "pointed [the gun] towards [Dominguez's] arm," without "aiming at a specific area on him," and pulled the trigger.

Christopher fired only one time, but the shot killed Dominguez. Braughton's mother called 911 and, with the help of a neighbor, performed CPR. Christopher put

the gun inside the house and waited outside for the police, to whom he identified himself as the shooter.

The Harris County District Attorney charged appellant with murder. He went to trial and was convicted of murder. The First Court of Appeals affirmed the jury's verdict in a 2-1 decision with Justice Evelyn Keyes issuing a 37-page dissent. On rehearing the Court issued a new opinion but again affirmed the verdict; Justice Keyes remained in dissent. Appellant moved for en banc reconsideration, but the Court denied this request. Justice Terry Jennings and Justice Keyes dissented from the denial of the request for en banc reconsideration.

Christopher Braughton filed a petition for discretionary review with this Court, and this Court granted the petition on December 6, 2017.

## ARGUMENT

### I. No Rational Juror Could Have Found Against Christopher's Self-Defense Claim Beyond a Reasonable Doubt.

It is the duty of appellate courts to "act as a procedural failsafe against irrational verdicts," *Dawkins v. State*, No. 08-13-00012-CR, -- S.W.3d --, 2016 WL 5957311, at *7 (Tex. App.–El Paso Oct. 14, 2016) (no pet.), and this Court is called upon to fulfill that duty in this case. As the United States Supreme Court has recognized, "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317 (1979). That is what happened here. Even

though "all of the credible evidence as to how the shooting transpired supports appellant's defensive theories," Dissenting Opinion at 32 (Dec. 29, 2016) ("Dissent"), the jury purportedly applied a standard of *beyond a reasonable doubt* and nevertheless rejected Christopher Braughton's insistence that the only reason he fired his gun was to protect himself and his family from a potentially lethal attack by the drunken man whom he had just witnessed beating his father. This was an irrational decision, and it must be vacated.

Because Christopher introduced evidence supporting his claim to have acted in self-defense, the State bore the burden to persuade the jury to reject Christopher's self-defense claim. In reviewing the jury's decision to reject Christopher's self-defense claim, the Court must "determine whether after viewing all the evidence in the light most favorable to the prosecution, any *rational* trier of fact would have . . . found against appellant on the self-defense issue *beyond a reasonable doubt*." *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (emphases added). The Court must apply this standard "robustly" and in a "rigorous" manner, "taking into account *all* of the evidence." *Brooks v. State*, 323 S.W.3d 893, 906 & n.26 (Tex. Crim. App. 2010). A mere "modicum" of evidence supporting the State does not suffice to establish a rational verdict. *Jackson*, 443 U.S. at 320. Nor is the jury permitted to speculate or to draw unreasonable inferences from the evidence in the record. *See Elizondo v. State*, 487 S.W.3d 185, 203 (Tex. Crim. App. 2016); *Temple*

5

*v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013); *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007).

Christopher's claim that he acted in self-defense is compelling in light of the evidence in the record upon which the jury rationally could rely. To briefly recount the events: On the evening in question, Christopher's parents and younger brother were driving home from dinner when a motorcycle driven by Emmanuel Dominguez roared into view from behind them and approached close enough to set off the vehicle's proximity alarm. The motorcycle then swerved around the car and stopped abruptly in front of it, forcing Braughton Sr. to slam on his brakes. Braughton Sr. passed the motorcycle and continued toward his home, but the motorcycle once again started coming around the vehicle and blocked the Braughtons' driveway. Braughton Sr. thus drove around the cul-de-sac where his home was located and stopped on the opposite side of the street. Dominguez dismounted the motorcycle, letting it fall to the ground on its side, and Braughton Sr. exited his vehicle. The two began arguing, and Dominguez then began punching Braughton Sr.

While all of this was happening, but before their car had come to a stop and Mr. Braughton exited, Mrs. Braughton frantically called Christopher, who had remained at home rather than joining his family for dinner, to tell him they were being chased. Christopher then retrieved his handgun and made it to the front door in time to see Dominguez beating his father and knocking him to the ground.

6

Christopher exited the home with his gun pointed in the air and said "Stop, I have a gun." According to several witnesses, Dominguez, using vulgar language, threatened that he had a "gun" or "something" for Christopher, and he reached for a saddlebag on his motorcycle. Christopher, understandably fearing that Dominguez was reaching for a weapon, pointed his firearm at Dominguez's arm and fired a single round. Dominguez was struck by the bullet and died from his injuries.

The court below acknowledged the presence of this evidence in the record, but nevertheless affirmed the jury's finding that Christopher did not act in self-defense. As the dissenting opinion makes clear, however, the court could only do so by "ignor[ing] the principle that the jury's ultimate conclusion *must be rational* in light of all of the evidence." Dissent at 16. Indeed, the court below could only affirm the judgment by engaging in *irrational* reasoning—e.g., relying on irrelevant evidence, citing wholly unreliable testimony, and engaging in groundless speculation.

*Irrelevant Evidence*. Several of the facts relied upon by the majority are simply irrelevant and do nothing to undermine Braughton's self-defense claim. For example, the majority reasoned that it was disputed whether Dominguez landed one punch or three punches in the altercation with Braughton Sr. *See* Opinion on Rehearing at 32–33 (Apr. 20, 2017) ("Majority"). But Christopher's self-defense claim does not depend upon the number of punches Dominguez landed. The majority

7

also relied on the fact that Dominguez had stopped punching Braughton Sr. when Christopher shot him. *Id.* at 33. But Christopher did not claim otherwise—his theory of self-defense was not that he needed to stop Dominguez from beating his father with his fists, but rather that he needed to stop Dominguez before he could attack him or his father with the weapon he had threatened him with. The majority noted that Bannon, a neighbor who witnessed some of the events, did not see any punches thrown. *Id.* at 37 n.11. But it was undisputed that Bannon *left the scene and entered his home* after seeing Christopher come out of his house with his firearm, *id.* at 13, and it is undisputed that Dominguez punched Braughton Sr. *at least once* because Braughton Sr.'s DNA was found on Dominguez's hand and Braughton Sr. had a busted lip, *id.* at 32. The majority emphasized that Dominguez ended up not having a firearm, *id.* at 34, but Christopher never claimed otherwise. Instead, he reasonably feared that Dominguez did have a weapon because Dominguez vulgarly threatened him with one and then reached for the saddlebag on his motorcycle. Christopher was not required to put himself and his family in further peril by waiting to be certain that Dominguez had a weapon before taking protective action.

*Unreliable testimony.* In addition to discussing irrelevant matters, the majority also discussed the testimony of "Gina," the pseudonym of a minor neighbor who claimed to witness the events in question through her bedroom window. But as the dissent cogently explained, "the jury could not rationally have believed Gina's

testimony in light of the other evidence." Dissent at 29. "Most importantly, her testimony was irreconcilable with the physical evidence. Gina was adamant in her trial testimony that appellant 'just walk[ed] straight to [Dominguez] and then he stop[ped],' that Dominguez was backing away from appellant with his hands up when he was shot, and that appellant remained stationary." *Id*. at 29. But the assistant medical examiner who conducted Dominguez's autopsy reported that, based on Dominguez's wound, it was physically *impossible* that he was "shot facing the shooter with his arms up." *Id*. That is not the only problem with Gina's testimony. Among other things, "Gina told the officers on the night of the shooting that *appellant* [as opposed to his father] and Dominguez argued regarding the amount of noise made by the motorcycle at night and began shoving each other, at which point appellant 'pulled out a gun.' " *Id*. at 31. Of course, "[t]hat scenario conflicts with not only her own testimony but also with that of every other witness to the shooting." *Id*. To top things off, Gina viewed the scene through a window screen designed to "*block 90 percent of visible light*," which she admitted "obscured details to the point that one could not determine whether a person on the other side was wearing glasses." *Id*. Gina's testimony was wholly incredible and did not provide a rational basis for the jury to reject Christopher's self-defense claim beyond a reasonable doubt.

*Groundless Speculation*. The majority finally engaged in baseless speculation in an apparent attempt to make up for the shortcomings in the evidence. As just explained, Gina's testimony that Dominguez was facing Christopher with his hands up when he was shot is irreconcilable with the physical evidence. In response to this problem, the majority cited testimony by the medical examiner that "Dominguez could have turned shortly before the shooting." Majority at 37. But this is entirely speculative—the medical examiner was not on the scene, and no one testified that Dominguez was facing Christopher with his hands up but then turned before the shooting. The majority also speculated that Mrs. Braughton may not have called Christopher because no phone records or data were introduced substantiating the fact that the call was made. *Id*. at 32. But this is wholly speculative; everyone who testified on this issue testified that Mrs. Braughton made the call. And apart from the call, there is no explanation for why Christopher retrieved his firearm and exited the house seeking to protect his family members—unless the explanation is that he independently heard or saw something that made him think there was a threat, in which case the absence of a call would not undermine his self-defense claim in any event.

For these reasons, Justice Keyes was correct to conclude that the majority's decision "provides itself no rational basis for determining that a rational jury would have found against appellant on the defenses of self-defense and defense of a third

10

person. Instead, it approves the jury's irrational evaluation of the evidence supporting appellant's defenses and, accordingly, irrationally affirms the judgment of the trial court." Dissent at 17.

Seeking to undermine Justice Keyes's opinion, the State argues that it incorrectly "advocates that the standard of review that an appellate court should employ when confronted with a defense, such as self-defense or defense of a third person, is that of factual sufficiency, not legal sufficiency." State's Brief on Discretionary Review at 18 (Feb. 22, 2018) ("State Br."). But that is patently incorrect, as shown by the plain language of Justice Keyes's opinion.

As this Court explained in *Brooks*, what distinguished the factual sufficiency standard it was rejecting from the legal sufficiency standard it was retaining was that under the former an appellate court was to view the evidence in "a neutral light," rather than "in the light most favorable to the verdict." 323 S.W.3d at 899. "Viewing the evidence in a 'neutral light' " meant that, unlike under a legal sufficiency standard, "the reviewing court [was] not required to defer to the jury's credibility and weight determinations and that the reviewing court [could] sit as a 'thirteenth juror' and disagree with a jury's resolution of conflicting evidence and with a jury's weighing of the evidence." *Id.* (quotation marks omitted).

With these principles in view, it is clear that Justice Keyes did not advocate for or apply a factual sufficiency standard in her dissent. Justice Keyes stated that

"the reviewing court's task is to determine whether after viewing the evidence *in the light most favorable to the prosecution*, any rational trier of fact would have found . . . against appellant on the self-defense issue beyond a reasonable doubt." Dissent at 21–22 (emphasis added). The "proper standard of review," Justice Keyes accordingly acknowledged, "require[s] that we defer to the jury's credibility determinations," and it therefore leaves "the jury . . . free to reject some or all of any witness's testimony." *Id.* at 24, 32. But, Justice Keyes concluded, "*even when viewing the evidence in the light most favorable to [the] verdict*," "it was irrational of the jury" to conclude that Braughton did not act in self-defense. *Id.* at 25 (emphasis added).

The State takes particular issue with Justice Keyes's contention that an appellate court "must review all of the evidence that a *reasonable* jury would credit and must determine whether, in light of the state of evidence as a whole, a reasonable jury could have found . . . against appellant on his defensive issues beyond a reasonable doubt." State Br. at 19 (quoting Dissent at 23). But it is not clear what the problem with this statement is. When the issue is whether a jury's determination is a *rational* one, surely a court is correct to discount evidence that only an *unreasonable* jury could credit and findings that only an *unreasonable* jury could have made in light of the state of the evidence as a whole.

12

The duty of an appellate court in a case like this one is to "review the evidence that a *rational* jury could have credited in rejecting [self-defense] as insufficiently supported by the evidence beyond a reasonable doubt and to determine whether that evidence was, in fact, sufficient to support rejection of the defense—not to rubber stamp the findings of juries." Dissent at 24. Because the appellate court in this case failed to fulfill that duty, the decision below must be reversed, and Christopher's conviction must be vacated.

## II. The Court of Appeals' Decision Threatens to Undermine the Right to Self-Defense.

The decision below not only is wrong on the merits but also threatens to undermine the right to self-defense by affording it inadequate protection from irrational jury verdicts. The Constitution of the United States protects "the right of the people to keep and bear Arms," U.S. CONST. amend. II, and the Texas Constitution guarantees "[e]very citizen . . . the right to keep and bear arms in the lawful defense of himself or the State," TEX. CONST. art. I, § 23. As the U.S. Supreme Court held in the landmark decision, *District of Columbia v. Heller*, "the *central component*" of this right to bear arms is the individual "right of self-preservation," the citizen's natural prerogative "to 'repel force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.' " 554 U.S. 570, 595, 599 (2008) (brackets omitted) (quoting 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAW OF ENGLAND *145–46 n.42 (St. George Tucker ed., 1803)). Modern social

13

science shows the wisdom of the protection the Framers enshrined in the fundamental laws they established. Each year, millions of Americans use firearms to defend themselves, their families, or their homes from a criminal assailant—multiples more, on the best available evidence, than the number of criminals who use firearms for ill. GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 160 (2006). Many of the law-abiding citizens who engage in defensive gun use are Texans, who will be forced to make a life-or-death choice in the shadow of this State's legal standards governing justified use of force. By not holding the State to its burden of persuasion on self-defense claims, the decision below affords inadequate protection to these law-abiding citizens and will likely result in an increased loss of life. In light of these stakes, this Court should overturn the decision below.

The use of firearms by law-abiding citizens for self-defense is very common and highly effective. The leading study designed to gauge the frequency of defensive gun use ("DGU") found that every year there are roughly 2.5 million DGUs. KLECK, TARGETING GUNS, *supra*, at 150–51 (describing results of the National Self-Defense Survey); *see also* GARY KLECK & DON B. KATES, JR., ARMED: NEW PERSPECTIVES ON GUN CONTROL 224–26 (2001).

A few scholars have disputed the frequency of defensive gun use. For instance, gun-control proponent Dr. David Hemenway claims, based on the National

Crime Victimization Survey ("NCVS"), that there are only 60,000 to 120,000 DGUs per year. *See* David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results from a National Survey*, 15 VIOLENCE & VICTIMS 257, 258 (2000). But that survey was not designed to measure DGUs, and estimates of DGUs based upon it are wholly unsupported by other sources. In contrast, Dr. Kleck's results, indicating approximately 2.5 million DGUs per year, *are supported by the results of at least 19 other studies*, including those conducted or sponsored by organizations such as the federal Centers for Disease Control and Prevention, the Police Foundation, the U.S. Justice Department, and the Washington Post. KLECK & KATES, ARMED, at 228–31. Indeed, Dr. Hemenway *himself served on the board* that designed one of the principal studies that has confirmed Dr. Kleck's research about the prevalence of DGUs.[4]

The debate over firearms regulation is so ridden with strife that statisticians, criminologists, and public health researchers can sometimes sound less like objective social scientists than zealous advocates. It is important to keep in mind, therefore, that not all articles on firearms regulation are created equal. The most

---

[4]     *Id.* at 265. The study, the Police Foundation's National Survey of the Private Ownership of Firearms, found that "1.44% of the adult population had used a gun for protection against a person in the previous year, implying 2.73 million defensive gun users." KLECK, TARGETING GUNS at 151–52. This figure, like Dr. Kleck's own lower estimate of 2.2 to 2.5 million incidents of DGU per year, "is probably a conservative estimate . . . [because] cases of [respondents] intentionally withholding reports of genuine DGUs were probably more common than cases of [respondents] falsely reporting incidents that did not occur or that were not genuinely defensive." *Id.* at 151.

persuasive studies are those conducted by respected, independent groups and that systematically review *the entire body of firearms social science*. We therefore refer this Court to the National Academy of Sciences, established by Congress to provide independent, objective advice to the nation on matters related to science and technology, which has conducted a comprehensive review of the relevant social-science literature "to assess the data and research on firearms." FIREARMS AND VIOLENCE: A CRITICAL REVIEW 13 (Charles F. Wellford, John V. Pepper & Carol V. Petrie eds. 2005) ("NATIONAL RESEARCH COUNCIL REVIEW").

The NRC undertook "an assessment of the strengths and limitations of the existing research and data on gun violence." NATIONAL RESEARCH COUNCIL REVIEW at 1. Its goal was "to raise the science of firearms research so that it can begin to inform public policy." *Id*. at x. The NRC surveyed *all* the extant literature on firearms regulation—hundreds of books, journal articles, and peer-reviewed studies. *See id*. at 22–31, 78, 130–33, 156–61, 174–77, 186–93, 242–68.[5] The National Research Council noted that Dr. Kleck's estimate of defensive gun use from the National Self-Defense Survey ("NSDS") was much larger than the NCVS estimate preferred by Dr. Hemenway. NATIONAL RESEARCH COUNCIL REVIEW at 103. It went

---

[5] By one count, the NRC reviewed "253 journal articles, 99 books, 43 government publications, and some original empirical research." *See* Don B. Kates & Gary Mauser, *Would Banning Firearms Reduce Murder and Suicide? A Review of International and Some Domestic Evidence*, 30 HARV. J. L. & PUB. POL'Y 649, 654 (2007).

on to note, however, that Dr. Kleck's results have been replicated and confirmed, whereas Dr. Hemenway's have not: "*At least 19 other surveys* have resulted in estimated numbers of defensive gun uses that are similar (*i.e.*, statistically indistinguishable) to the results found[ ] by Kleck and Gertz. *No other surveys have found numbers consistent with the NCVS*" figures used by Dr. Hemenway. *Id.* (emphases added). *See also id.* at 113. And the NRC noted that even the most conservative estimates of DGU indicate "hundreds of defensive uses every day." *Id*. at 102.

Defensive gun uses are not only common, they are also effective. Hundreds of thousands of people each year use firearms in situations in which the defenders claim that they "almost certainly" saved a life by doing so. Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 180 (1995). Numerous studies have also found that robbery victims who resist with firearms are significantly less likely to have their property taken and are also less likely to be injured. KLECK, TARGETING GUNS, *supra*, at 170. "Robbery and assault victims who used a gun to resist were less likely to be attacked or to suffer an injury than those who used any other methods of self-protection or those who did not resist at all." *Id.* at 171. Similarly, "rape victims using armed resistance were less likely to have the rape attempt completed against them than victims using any other mode of resistance." *Id.* at 175. Indeed,

17

Justice Department statistics reveal that the probability of serious injury from any kind of attack is 2.5 times greater for women offering no resistance than for women resisting with a gun. Lawrence Southwick, Jr., *Self-defense with guns: The consequences*, 28 J. CRIM. JUST. 351, 362 tbl.6 (2000).

In fact, to prevent completion of a crime, it is usually necessary only for the intended victim to display the firearm rather than pull the trigger. The National Self-Defense Survey found that defenders actually fired their firearm in only 24% of DGUs, and only 8% of respondents reported wounding their attacker. KLECK & KATES, ARMED, *supra*, at 317–18. Indeed, according to survey data, 43% of violent criminals report that they have in at least one instance during their careers decided not to commit a crime as intended because they believed the victim was armed. KLECK, TARGETING GUNS, *supra*, at 180. Fewer than one in a thousand defensive gun uses results in a criminal being killed. *Id.* at 178. And fewer than "1-in-90,000" attempts at defensive gun use result in a householder shooting a family member mistaken for a criminal. *Id.* at 168.

While some anti-gun commentators suggest that the possession of self-defense arms does more harm than good because criminals can forcibly disarm their victims and use their own firearms against them, data from the U.S. Bureau of Justice Statistics indicate that, in confrontations with criminals, 99% of victims maintain control of their firearms. *Id*. at 168–69. And even the 1% of DGUs that result in

criminals taking firearms away from defenders is probably an overestimate, because it includes, for example, instances where a burglar leaving a home with a victim's weapon is confronted by the victim wielding a second firearm. *Id.* at 169.

Of course, some dispute the efficacy of defensive gun use. For example, a 2009 study by Charles Branas and his co-authors argued that individuals who possessed firearms were "more likely to be shot in an assault than those not in possession." Charles C. Branas, et al., *Investigating the link between gun possession and gun assault*, 99 AMER. J. PUB. HEALTH 1, 4 (2009). The Branas study, however, like others of its ilk, merely found that there was an *association* between victim gun possession and being shot, not that there was a *causal link*. *See id.* at 4–5. Regardless of the effectiveness of defensive gun use, one would *expect* a positive association between victim gun possession and victim injury, because those people most at risk of victimization (because, for example, they reside in a dangerous neighborhood) are also the *most likely to arm themselves for protection*.

> By way of analogy, we don't suggest that pacemakers cause heart attacks, or don't protect against heart attacks, just because we find a correlation between the presence of pacemaker and the incidence of heart attacks. Obviously, people might get pacemakers precisely because they're at risk of heart attacks. Well, people might get guns precisely because they're at risk of attack.

Eugene Volokh, *"Guns Did Not Protect Those Who Possessed Them from Being Shot in an Assault"*, THE VOLOKH CONSPIRACY (Oct. 5, 2009),

https://goo.gl/Gb46id; *see also Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (criticizing the Branas and similar studies on this ground).

There are also some studies purporting to link high rates of gun ownership with high rates of homicide. Here, too, even if statistical *associations* between gun ownership and homicide may exist, no *causal link* has been demonstrated. NATIONAL RESEARCH COUNCIL REVIEW at 5. Moreover, this body of research was reviewed by the National Research Council and dismissed as proving nothing. The NRC committee identified three fatal flaws in this research: First, "these studies do not adequately address the problem of self-selection. Second, these studies must rely on proxy measures of ownership that are certain to create biases of unknown magnitude and direction. Third, . . . there is no way of knowing whether the homicides or suicides occurred in the same areas in which the firearms are owned." *Id.* at 6. Therefore, the studies "do not credibly demonstrate a causal relationship between the ownership of firearms and the causes or prevention of criminal violence or suicide." *Id.*

Others posit that private possession of firearms for self-defense may lead to an increase in injuries because it could initiate a sort of arms race whereby criminals are more motivated to carry guns by the anticipation that their victims may be armed. *See, e.g.*, Philip J. Cook, et al., *Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009). This

speculation is based on surveys interviewing criminals about their thoughts on firearms. A look at the underlying survey research refutes the argument.

Far from concluding that armed victims motivated criminals to carry guns, the study in question actually demonstrated that criminals were *deterred* by the prospect of facing armed resistance. *See* JAMES D. WRIGHT & PETER H. ROSSI, ARMED AND CONSIDERED DANGEROUS 155 tbl.7.5 (2d ed. 2008) (40% of the criminals surveyed said they had on at least one occasion decided not to commit a crime because they knew or believed the victim was carrying a gun; 69% said they knew a crook who had been "scared off, shot at, wounded, captured, or killed by an armed victim"); *id.* at 146 tbl.7.1 (58% of felons surveyed agreed or strongly agreed that "[a] store owner who is known to keep a gun on the premises is not going to get robbed very often," and 56% agreed or strongly agreed that "[a] criminal is not going to mess around with a victim he knows is armed with a gun"). And the likelihood that their intended victim might be armed was merely one of nine reasons that, according to a majority of the criminals surveyed, played a significant role in the criminals' decision to carry guns themselves. *See id.* at 128.

All told, then, there is substantial empirical support for the conclusion that law-abiding citizens who exercise their right to keep and bear arms for self-defense are quite often able successfully to defend themselves, their family, or their property from criminal attack—yielding a substantial public safety benefit.

What is more, the individuals most likely to avail themselves of the benefits of armed self-defense are an overwhelmingly law-abiding group. Researchers have found that "concealed carry licensees [in Texas] had arrest rates far lower than the general population for every category of crime." H. Sterling Burnett, *Texas Concealed Handgun Carriers: Law-Abiding Public Benefactors* 1, NATIONAL CENTER FOR POLICY ANALYSIS (2000), https://goo.gl/mm4Roc. Indeed, in 2016, carry licensees in Texas were approximately *17 times* less likely to be convicted of a crime than the average Texan. Of the 42,797 convictions of individuals aged 21 and older in Texas in 2016, only 148 (less than 0.35%) of the convictions were of handgun license holders. *Conviction Rates for Handgun License Holders, Reporting Period: 01/01/2016–12/31/2016*, TEXAS DEPARTMENT OF PUBLIC SAFETY, https://goo.gl/uSxNse. By contrast, in that year, handgun license holders represented over 4% of Texas's *total* population, and approximately 6% of individuals aged 21 and older.[6]

It follows that this group will be more sensitive to changes in the rules that govern their conduct. In order to safeguard the fundamental constitutional right to

---

[6] *See Active License/Certified Instructor Counts as of December 31, 2016*, TEXAS DEPARTMENT OF PUBLIC SAFETY, https://goo.gl/GLNQNY (1,150,745 active license holders); *Texas Population Projections Program*, TEXAS DEMOGRAPHIC CENTER, https://goo.gl/2K72LU (projecting 26,438,031 as the population of Texas in 2016). In Texas, one generally must be at least 21 years of age to obtain a license, TEX. GOV'T CODE § 411.172(a)(2), meaning that the vast majority of the 1,150,745 active license holders are presumptively greater than 21 years of age, whereas only approximately 18 million of Texas's total population is over 21.

self-defense—and to continue to reap the significant public safety benefits that flow from the right—it is thus important to ensure that these law-abiding individuals continue to operate under the auspices of a law that adequately protects their right of self-defense.

## CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, the NRA respectfully requests that this Court reverse the decision of the First Court of Appeals from Houston.

Respectfully Submitted,

/s/ Brady Wyatt

| | |
|---|---|
| David H. Thompson | Brady Wyatt |
| John D. Ohlendorf | LAW OFFICE OF BRADY WYATT, III |
| Haley N. Proctor | State Bar (Texas) No. 24008313 |
| COOPER & KIRK, PLLC | 3300 Oak Lawn, Suite 600 |
| 1523 New Hampshire Ave., N.W. | Dallas, Texas 75219 |
| Washington, D.C. 20036 | Phone: (214) 559-9115 |
| (202) 220-9600 | Email: Attywyatt@hotmail.com |
| (202) 220-9601 (fax) | |
| dthompson@cooperkirk.com | |

*Counsel for Amicus Curiae the National Rifle Association of America, Inc.*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of TEX. R. APP. P. 9.4(i) because it contains 5,491 words, excluding parts and words as allowed by TEX. R. APP. P. 9.4(i)(1).

2. This brief complies with the typeface requirements of TEX. R. APP. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font, except for footnotes, which appear using 12-point Times New Roman font.

3. Dated: March 5, 2018.

/s/ Brady Wyatt
Brady Wyatt

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2018, a true and correct copy of the foregoing *Amicus Curiae* Brief of the National Rifle Association of America, Inc., in Support of Appellant has been served on all counsel of record by electronic service as all parties are registered users.

*Counsel for Appellant*:

Niles Illich
The Law Office of Niles Illich, Ph.D., J.D.
701 Commerce, Suite 400
Dallas, Texas 75202
Niles@appealstx.com

*Counsel for Appellee*:

Melissa Hervey Stryker
Assistant District Attorney
Harris County, Texas
1201 Franklin Street, Suite 600
Houston, Texas 77002
Stryker_Melissa@dao.hctx.net

AND

Stacey Soule
State Prosecuting Attorney
P.O. Box 13046
Austin, Texas 78711
information@spa.texas.gov

/s/ Brady Wyatt
Brady Wyatt