POSNER, Circuit Judge.
These two appeals, consolidated for oral argument, challenge denials of declaratory and injunctive relief sought in materially identical suits under the Second Amendment. An Illinois law forbids a person, with exceptions mainly for police and other security personnel, hunters, and members of target shooting clubs, 720 ILCS 5/24-2, to carry a gun ready to use (loaded, immediately accessible — that is, easy to reach— and uncased). There are exceptions for a person on his own property (owned or rented), or in his home (but if it’s an apartment, only there and not in the apartment building’s common areas), or in his fixed place of business, or on the property of someone who has permitted him to be there with a ready-to-use gun. 720 ILCS 5/24-1(a)(4), (10), -1.6(a); see People v. Diggins, 235 Ill.2d 48, 335 Ill.Dec. 608, 919 N.E.2d 327, 332 (2009); People v. Laubscher, 183 Ill.2d 330, 233 Ill.Dec. 639, 701 N.E.2d 489, 490-92 (1998); People v. Smith, 71 Ill.2d 95, 15 Ill.Dec. 864, 374 N.E.2d 472, 475 (1978); People v. Pulley, 345 Ill.App.3d 916, 281 Ill.Dec. 332, 803 N.E.2d 953, 957-58, 961 (2004). Even carrying an unloaded gun in public, if it’s uncased and immediately accessible, is prohibited, other than to police and other excepted persons, unless carried openly outside a vehicle in an unincorporated area and ammunition for the gun is not immediately accessible. 720 ILCS 5/24-1(a)(4)(iii), (10)(iii), -1.6(a)(3)(B).
The appellants contend that the Illinois law violates the Second Amendment as interpreted in District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 *935 L.Ed.2d 637 (2008), and held applicable to the states in McDonald v. City of Chicago, — U.S.-, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). Heller held that the Second Amendment protects “the right of law-abiding, responsible citizens to use arms in defense of hearth and home.” 554 U.S. at 635, 128 S.Ct. 2783. But the Supreme Court has not yet addressed the question whether the Second Amendment creates a right of self-defense outside the home. The district courts ruled that it does not, and so dismissed the two suits for failure to state a claim.
The parties and the amici curiae have treated us to hundreds of pages of argument, in nine briefs. The main focus of these submissions is history. The supporters of the Illinois law present historical evidence that there was no generally recognized private right to carry arms in public in 1791, the year the Second Amendment was ratified — the critical year for determining the amendment’s historical meaning, according to McDonald v. City of Chicago, supra, 130 S.Ct. at 3035 and n. 14. Similar evidence against the existence of an eighteenth-century right to have weapons in the home for purposes of self-defense rather than just militia duty had of course been presented to the Supreme Court in the Heller case. See, e.g., Saul Cornell, A Well-Regulated Militia 2-4, 58-65 (2006); Lois G. Schwoerer, “To Hold and Bear Arms: The English Perspective,” 76 Chi.-Kent L.Rev. 27, 34-38 (2000); Don Higginbotham, “The Second Amendment in Historical Context,” 16 Constitutional Commentary 263, 265 (1999). The District of Columbia had argued that “the original understanding of the Second Amendment was neither an individual right of self-defense nor a collective right of the states, but rather a civic right that guaranteed that citizens would be able to keep and bear those arms needed to meet their legal obligation to participate in a well-regulated militia.” Cornell, supra, at 2; see also Paul Finkelman, “ ‘A Well Regulated Militia’: The Second Amendment in Historical Perspective,” 76 Chi-Kent L.Rev. 195, 213-14 (2000); Don Higginbotham, “The Federalized Militia Debate: A Neglected Aspect of Second Amendment Scholarship,” 55 William & Mary Q. 39, 47-50 (1998); Roy G. Weatherup, “Standing Armies and Armed Citizens: An Historical Analysis of the Second Amendment,” 2 Hastings Constitutional L.Q. 961, 994-95 (1975).
The Supreme Court rejected the argument. The appellees ask us to repudiate the Court’s historical analysis. That we can’t do. Nor can we ignore the implication of the analysis that the constitutional right of armed self-defense is broader than the right to have a gun in one’s home. The first sentence of the McDonald opinion states that “two years ago, in District of Columbia v. Heller, we held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense,” McDonald v. City of Chicago, supra, 130 S.Ct. at 3026, and later in the opinion we read that “Heller explored the right’s origins, noting that the 1689 English Bill of Rights explicitly protected a right to keep arms for self-defense, 554 U.S. at 593, 128 S.Ct. 2783, and that by 1765, Blackstone was able to assert that the right to keep and bear arms was ‘one of the fundamental rights of Englishmen,’ id. at 594, 128 S.Ct. 2783.” 130 S.Ct. at 3037. And immediately the Court adds that “Blackstone’s assessment was shared by the American colonists.” Id.
Both Heller and McDonald do say that “the need for defense of self, family, and property is most acute” in the home, id. at 3036 (emphasis added); 554 U.S. at 628, 128 S.Ct. 2783, but that doesn’t mean it is not acute outside the home. Heller repeatedly invokes a broader Second Amendment right than the right to have a *936 gun in one’s home, as when it says that the amendment “guarantee^] the individual right to possess and carry weapons in case of confrontation.” 554 U.S. at 592, 128 S.Ct. 2783. Confrontations are not limited to the home.
The Second Amendment states in its entirety that “a well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed” (emphasis added). The right to “bear” as distinct from the right to “keep” arms is unlikely to refer to the home. To speak of “bearing” arms within one’s home would at all times have been an awkward usage. A right to bear arms thus implies a right to carry a loaded gun outside the home.
And one doesn’t have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home. Suppose one lived in what was then the wild west — the Ohio Valley for example (for until the Louisiana Purchase the Mississippi River was the western boundary of the United States), where there were hostile Indians. One would need from time to time to leave one’s home to obtain supplies from the nearest trading post, and en route one would be as much (probably more) at risk if unarmed as one would be in one’s home unarmed.
The situation in England was different— there was no wilderness and there were no hostile Indians and the right to hunt was largely limited to landowners, Schwoerer, supra, at 34-35, who were few. Defenders of the Illinois law reach back to the fourteenth-century Statute of Northampton, which provided that unless on King’s business no man could “go nor ride armed by night nor by day, in Fairs, markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere.” 2 Edw. Ill, c. 3 (1328). Chief Justice Coke interpreted the statute to allow a person to possess weapons inside the home but not to “assemble force, though he be extremely threatened, to go with him to church, or market, or any other place.” Edward Coke, Institutes of the Laws of England 162 (1797). But the statute enumerated the locations at which going armed was thought dangerous to public safety (such as in fairs or in the presence of judges), and Coke’s reference' to “assemble force” suggests that the statutory limitation of the right of self-defense was based on a concern with armed gangs, thieves, and assassins rather than with indoors versus outdoors as such.
In similar vein Sir John Knight’s Case, 87 Eng. Rep. 75, 76 (K.B.1686), interpreted the statute as punishing “people who go armed to terrify the King’s subjects.” Some weapons do not terrify the public (such as well-concealed weapons), and so if the statute was (as it may have been) intended to protect the public from being frightened or intimidated by the brandishing of weapons, it could not have applied to all weapons or all carriage of weapons. Blackstone’s summary of the statute is similar: “the offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land.” 4 Commentaries on the Law of England 148-49 (1769) (emphasis added). Heller treated Blackstone’s reference to “dangerous or unusual weapons” as evidence that the ownership of some types of firearms is not protected by the Second Amendment, 554 U.S. at 627, 128 S.Ct. 2783, but the Court cannot have thought all guns are “dangerous or unusual” and can be banned, as otherwise there would be no right to keep a handgun in one’s home for self-defense. And while another English source, Robert Gardiner, The Compleat Constable 18-19 (3d ed. 1707), says that constables “may seize and take away” *937 loaded guns worn or carried by persons not doing the King’s business, it does not specify the circumstances that would make the exercise of such authority proper, let alone would warrant a prosecution.
Blackstone described the right of armed self-preservation as a fundamental natural right of Englishmen, on a par with seeking redress in the courts or petitioning the government. 1 Blackstone, supra, at 136, 139-40. The Court in Heller inferred from this that eighteenth-century English law recognized a right to possess guns for resistance, self-preservation, self-defense, and protection against both public and private violence. 554 U.S. at 594, 128 S.Ct. 2783. The Court said that American law was the same. Id. at 594-95, 128 S.Ct. 2783. And in contrast to the situation in England, in less peaceable America a distinction between keeping arms for self-defense in the home and carrying them outside the home would, as we said, have been irrational. All this is debatable of course, but we are bound by the Supreme Court’s historical analysis because it was central to the Court’s holding in Heller.
Twenty-first century Illinois has no hostile Indians. But a Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower. A woman who is being stalked or has obtained a protective order against a violent ex-husband is more vulnerable to being attacked while walking to or from her home than when inside. She has a stronger self-defense claim to be allowed to carry a gun in public than the resident of a fancy apartment building (complete with doorman) has a claim to sleep with a loaded gun under her mattress. But Illinois wants to deny the former claim, while compelled by McDonald to honor the latter. That creates an arbitrary difference. To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in Heller and McDonald. It is not a property right — a right to kill a houseguest who in a fit of aesthetic fury tries to slash your copy of Norman Rockwell’s painting Santa with Elves. That is not self-defense, and this case like Heller and McDonald is just about self-defense.
A gun is a potential danger to more people if carried in public than just kept in the home. But the other side of this coin is that knowing that many law-abiding citizens are walking the streets armed may make criminals timid. Given that in Chicago, at least, most murders occur outside the home, Chicago Police Dep’t, Crime at a Glance: District 1 13 (Jan.-June 2010), the net effect on crime rates in general and murder rates in particular of allowing the carriage of guns in public is uncertain both as a matter of theory and empirically. “Based on findings from national law assessments, cross-national comparisons, and index studies, evidence is insufficient to determine whether the degree or intensity of firearms regulation is associated with decreased (or increased) violence.” Robert A. Hahn et al., “Firearms Laws and the Reduction of Violence: A Systematic Re view,” 28 Am. J. Preventive Med. 40, 59 (2005); cf. John J. Donohue, “The Impact of Concealed-Carry Laws,” in Evaluating Gun Policy Effects on Crime and Violence 287, 314-21 (2003). “Whether the net effect of relaxing concealed-carry laws is to increase or reduce the burden of crime, there is good reason to believe that the net is not large.... [T]he change in gun carrying appears to be concentrated in rural and suburban areas where crime rates are already relatively low, among people who are at relatively low risk of victimization — white, middle-aged, middle-class males. The available data about permit holders also imply that they are at fairly low risk of misusing guns, consistent with the relatively low arrest rates ob *938 served to date for permit holders. Based on available empirical data, therefore, we expect relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand.” Philip J. Cook, Jens Ludwig & Adam M. Samaha, “Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective,” 56 UCLA L.Rev. 1041, 1082 (2009); see also H. Sterling Burnett, “Texas Concealed Handgun Carriers; Law-Abiding Public Benefactors,” www.ncpa.org/pdfs/ba 324.pdf (visited Oct. 29, 2012). But we note' with disapproval that the opening brief for the plaintiffs in appeal no. 12-1788, in quoting the last sentence above from the article by Cook and his colleagues, deleted without ellipses the last clause — -assuming that some sort of permit system for public carry is allowed to stand.”
If guns cannot be carried outside the home, an officer who has reasonable suspicion to stop and frisk a person and finds a concealed gun on him can arrest him, as in United States v. Mayo, 361 F.3d 802, 804-08 (4th Cir.2004), and thus take the gun off the street before a shooting occurs; and this is argued to support the ban on carrying guns outside the home. But it is a weak argument. Often the officer will have no suspicion (the gun is concealed, after all). And a state may be able to require “op'en carry” — that is, require persons who carry a gun in public to carry it in plain view rather than concealed. See District of Columbia v. Heller, supra, 554 U.S. at 626, 128 S.Ct. 2783; James Bishop, Note, “Hidden or on the Hip: The Right(s) to Carry After Heller," 97 Cornell L.Rev. 907, 920-21 (2012). Many criminals would continue to conceal the guns they carried, in order to preserve the element of surprise and avoid the price of a gun permit; so the police would have the same opportunities (limited as they are, if the concealment is effective and the concealer does not behave suspiciously) that they do today to take concealed guns off the street.
Some studies have found that an increase in gun ownership causes an increase in homicide rates. Mark Duggan’s study, reported in his article “More Guns, More Crime,” 109 J. Pol. Econ. 1086, 1112 (2001), is exemplary; and see also Philip J. Cook & Jens Ludwig, “The Social Costs of Gun Ownership,” 90 J. Pub. Econ. 379, 387 (2006). But the issue in this case isn’t ownership; it’s carrying guns in public. Duggan’s study finds that even the concealed carrying of guns, which many states allow, doesn’t lead to an increase in gun ownership. 109 J. Pol. Econ. at 1106-07. Moreover, violent crime in the United States has been falling for many years and so has gun ownership, Patrick Egan, “The Declining Culture of Guns and Violence in the United States,” www.themonkeycage. orgddog/2012/07/21/the-declining-cultureof-guns-and-violence-in-the-united-states (visited Oct. 29, 2012); see also Tom W. Smith, “Public Attitudes Towards the Regulation of Firearms” 10 (University of Chicago Nat’l Opinion Research Center, Mar. 2007), http://icpgv.org/pdfdSi ORCPolLpdf (visited Oct. 29, 2012) — in the same period in which gun laws have become more permissive.
A few studies find that states that allow concealed carriage of guns outside the home and impose minimal restrictions on obtaining a gun permit have experienced increases in assault rates, though not in homicide rates. See Ian Ayres & John J. Donohue III, “More Guns, Less Crime Fails Again: The Latest Evidence From 1977-2006,” 6 Econ. J. Watch 218, 224 (2009). But it has not been shown that those increases persist. Of another, similar paper by Ayres and Donohue, “Shooting Down the ‘More Guns, Less Crime’ Hypothesis,” 55 Stan. L.Rev. 1193, 1270-85 *939 (2003), it has been said that if they “had extended their analysis by one more year, they would have concluded that these laws [laws allowing concealed handguns to be carried in public] reduce crime.” Carlisle E. Moody & Thomas B. Marvell, “The Debate on Shall-Issue Laws,” 5 Econ. J. Watch 269, 291 (2008). Ayres and Donohue disagree that such laws reduce crime, but they admit that data and modeling problems prevent a strong claim that they increase crime. 55 Stan. L.Rev. at 1281-82, 1286-87; 6 Econ. J. Watch at 230-31.
Concealed carriage of guns might increase the death rate from assaults rather than increase the number of assaults. But the studies don’t find that laws that allow concealed carriage increase the death rate from shootings, and this in turn casts doubt on the finding of an increased crime rate when concealed carriage is allowed; for if there were more confrontations with an armed criminal, one would expect more shootings. Moreover, there is no reason to expect Illinois to impose minimal permit restrictions on carriage of guns outside the home, for obviously this is not a state that has a strong pro-gun culture, unlike the states that began allowing concealed carriage before Heller and McDonald enlarged the scope of Second Amendment rights.
Charles C. Branas et ah, “Investigating the Link Between Gun Possession and Gun Assault,” 99 Am. J. of Pub. Health 2034, 2037 (2009), finds that assault victims are more likely to be armed than the rest of the population is, which might be thought evidence that going armed is not effective self-defense. But that finding does not illuminate the deterrent effect of knowing that potential victims may be armed. David Hemenway & Deborah Azrael, “The Relative Frequency of Offensive and Defensive Gun Uses: Results from a National Survey,” 15 Violence & Victims 257, 271 (2000), finds that a person carrying a gun is more likely to use it to commit a crime than to defend himself from criminals. But that is like saying that soldiers are more likely to be armed than civilians. And because fewer than 3 percent of gun-related deaths are from accidents, Hahn et al., supra, at 40, and because Illinois allows the use of guns in hunting and target shooting, the law cannot plausibly be defended on the ground that it reduces the accidental death rate, unless it could be shown that allowing guns to be carried in public causes gun ownership to increase, and we have seen that there is no evidence of that.
In sum, the empirical literature on the effects of allowing the carriage of guns in public fails to establish a pragmatic defense of the Illinois law. Bishop, supra, at 922-23; Mark V. Tushnet, Out of Range: Why the Constitution Can’t End the Battle over Guns 110-11 (2007). Anyway the Supreme Court made clear in Heller that it wasn’t going to make the right to bear arms depend on casualty counts. 554 U.S. at 636, 128 S.Ct. 2783. If the mere possibility that allowing guns to be carried in public would increase the crime or death rates sufficed to justify a ban, Heller would have been decided the other way, for that possibility was as great in the District of Columbia as it is in Illinois.
And a ban as broad as Illinois’s can’t be upheld merely on the ground that it’s not irrational. Ezell v. City of Chicago, 651 F.3d 684, 701 (7th Cir.2011); United States v. Yancey, 621 F.3d 681, 6.83 (7th Cir.2010) (per curiam); see also District of Columbia v. Heller, supra, 554 U.S. at 628 n. 27, 128 S.Ct. 2783; United States v. Chester, 628 F.3d 673, 679-80 (4th Cir.2010). Otherwise this court wouldn’t have needed, in United States v. Skoien, 614 F.3d 638, 643^14 (7th Cir.2010) (en banc), to marshal extensive empirical evidence to justify the less restrictive federal law that forbids a *940 person “who has been convicted in any court of a misdemeanor crime of domestic violence” to possess a firearm in or affecting interstate commerce. 18 U.S.C. § 922(g)(9). In Skoien we said that the government had to make a “strong showing” that a gun ban was vital to public safety — it was not enough that the ban was “rational.” 614 F.3d at 641. Illinois has not made that strong showing — and it would have to make a stronger showing in this case than the government did in Skoien, because the curtailment of gun rights was much narrower: there the gun rights of persons convicted of domestic violence, here the gun rights of the entire law-abiding adult population of Illinois.
A blanket'prohibition on carrying gun in public prevents a person from defending himself anywhere except inside his home; and 'so substantial a curtailment of the right of armed self-defense requires a greater showing of justification than merely' that the public might benefit on balance from such a curtailment, though there is no proof it would. In contrast, when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that’s a lesser burden, the state doesn’t need to prove so strong a need. Similarly, the state can prevail with less evidence when, as in Skoien, guns are forbidden to a class of persons who present a higher than average risk of misusing a gun. See also Ezell v. City of Chicago, supra, 651 F.3d at 708. And empirical evidence of a public safety concern can be dispensed with altogether when the ban is limited to obviously dangerous persons such as felons and the mentally ill. District of Columbia v. Heller, supra, 554 U.S. at 626, 128 S.Ct. 2783. Illinois has lots of options for protecting its people •from being shot without having to eliminate- all possibility of armed self-defense in public.
Remarkably, Illinois is the only state that maintains a flat ban on carrying ready-to-use guns outside the home, though many states used to ban carrying concealed guns outside the home, Bishop, supra, at 910; David B. Kopel, “The Second Amendment in the Nineteenth Century,” 1998 BYU L.Rev. 1359, 1432-33 (1998) — a more limited prohibition than Illinois’s, however. Not even Massachusetts has so flat a ban as Illinois, though the District of Columbia does, see D.C.Code §§ 22^504 to -4504.02, and a few states did during the nineteenth century, Kachalsky v. County of Westchester, 701 F.3d 81, 89-91 (2d Cir.2012) — but no longer.
It is not that all states but Illinois are indifferent to the dangers that widespread public carrying of guns may pose. Some may be. But others have decided that a proper balance between the interest in self-defense and the dangers created by carrying guns in public is to limit the right to carry a gun to responsible persons rather than to ban public carriage altogether, as Illinois with its meager exceptions comes close to doing. Even jurisdictions like New York State, where officials have broad discretion to deny applications for gun permits, recognize that the interest in self-defense extends outside the home. There is no suggestion that some unique characteristic of criminal activity in Illinois justifies the state’s taking a different approach from the other 49 states. If the Illinois approach were demonstrably superior, one would expect at least one or two other states to have emulated it.
Apart from the usual prohibitions of gun ownership by children, felons, illegal aliens, lunatics, and in sensitive places such as public schools, the propriety of which was not questioned in Heller (“nothing in this opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the *941 mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings,” 554 U.S. at 626, 128 S.Ct. 2788), some states sensibly require that an applicant for a handgun permit establish his competence in handling firearms. A person who carries a gun in public but is not well trained in the use of firearms is a menace to himself and others. See Massad Ayoob, “The Subtleties of Safe Firearms Handling,” Backwoods Home Magazine, Jan./ Feb.2007, p. 30; Debra L. Karch, Linda L. Dahlberg & Nimesh Patel, “Surveillance for Violent Deaths — National Violent Death Reporting System, 16 States, 2007,” Morbidity and Mortality Weekly Report, p. 11, www.cdc.gov/mmwr/pdfiss/ss5904.pdf (visited Oct. 29, 2012). States also permit private businesses and other private institutions (such as churches) to ban guns from their premises. If enough private institutions decided to do that, the right to carry a gun in public would have much less value and might rarely be exercised — in which event the invalidation of the Illinois law might have little effect, which opponents of gun rights would welcome.
Recently the Second Circuit upheld a New York state law that requires an applicant for a permit to carry a concealed handgun in public to demonstrate “proper cause” to obtain a license. Kachalsky v. County of Westchester, supra. This is the inverse of laws that forbid dangerous persons to have handguns; New York places the burden on the applicant to show that he needs a handgun to ward off dangerous persons. As the court explained, 701 F.3d at 98, New York “decided not to ban handgun possession, but to limit it to those individuals who have an actual reason (‘proper cause’) to carry the weapon. In this vein, licensing is oriented to the Second Amendment’s protections.... [Instead of forbidding anyone from carrying a handgun in public, New York took a more moderate approach to fulfilling its important objective and reasonably concluded that only individuals having a bona fide reason to possess handguns should be allowed to introduce them into the public sphere.”
The New York gun law upheld in Kachalsky, although one of the nation’s most restrictive such laws (under the law’s “proper cause” standard, an applicant for a gun permit must demonstrate a need for self-defense greater than that of the general public, such as being the target of personal threats, id. at 92, 93), is less restrictive than Illinois’s law. Our principal reservation about the Second Circuit’s analysis (apart from disagreement, unnecessary to bore the reader with, with some of the historical analysis in the opinion— we regard the historical issues as settled by Heller) is its suggestion that the Second Amendment should have much greater scope inside the home than outside simply because other provisions of the Constitution have been held to make that distinction. For example, the opinion states that “in Lawrence v. Texas, the [Supreme] Court emphasized that the state’s efforts to regulate private sexual conduct between consenting adults is especially suspect when it intrudes into the home.” 2012 WL 5907502, at *9. Well of course — the interest in having sex inside one’s home is much greater than the interest in having sex on the sidewalk in front of one’s home. But the interest in self-protection is as great outside as inside the home. In any event the court in Kachalsky used the distinction between self-protection inside and outside the home mainly to suggest that a standard less demanding than “strict scrutiny” should govern the constitutionality of laws limiting the carrying of guns outside the home; our analysis is not based on degrees of scrutiny, but on Illinois’s failure to justify the most restrictive gun law of any of the 50 states.
*942 Judge Wilkinson expressed concern in United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir.2011), that “there may or may not be a Second Amendment right in some places beyond the home, but we have no idea what those places are, what the criteria for selecting them should be, what sliding scales of scrutiny might apply to them, or any one of a number of other questions. It is not clear in what places public authorities may ban firearms altogether without shouldering the burdens of litigation. The notion that ‘self-defense has to take place wherever [a] person happens to be,’ appears to us to portend all sorts of litigation over schools, airports, parks, public thoroughfares, and. various additional government facilities.... The whole matter strikes us as a vast terra incognita that courts should enter only upon necessity and only then by small degree” (citation omitted). Fair enough; but that “vast terra incognita ” has been opened to judicial exploration by Heller and McDonald. There is no turning back by the lower federal courts, though we need not speculate on the limits that Illinois may in the interest of public safety constitutionally impose on the carrying of guns in public; it is enough that the limits it has imposed go too far.
The usual consequence of reversing the dismissal of a suit (here a pair of suits) is to remand the cáse for evidentiary proceedings preparatory to the filing of motions for summary judgment and if those motions fail to an eventual trial. But there are no evidentiary issues in these two cases. The constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial. The evidence marshaled in the Skoien case was evidence of “legislative facts,” which is to say facts that bear on the justification for legislation, as distinct from facts concerning the conduct of parties in a particular case (“adjudicative facts”). See Fed.R.Evid. 201(a); Advisory Committee Note to Subdivision (a) of 1972 Proposed Rule [of • Evidence] 201. Only adjudicative facts are determined in trials, and only legislative facts are relevant to the constitutionality of the Illinois gun law. The key legislative facts in this case are the effects of the Illinois law; the state has failed to show that those effects are positive.
We are disinclined to engage in another round of historical analysis to determine whether eighteenth-century America understood the Second Amendment to include a right to bear guns outside the home. The Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside. The theoretical and empirical evidence (which overall is inconclusive) is consistent with concluding that a right to carry firearms in public may promote self-defense. Illinois had to provide us with more than merely a rational basis for believing that its uniquely sweeping ban is justified by an increase in public safety. It has failed to meet this burden. The Supreme Court’s interpretation of the Second Amendment therefore compels us to reverse the decisions in the two cases before- us and remand them to their respective district courts for the entry of declarations of unconstitutionality and permanent injunctions. Nevertheless we order our mandate stayed for 180 days to allow the Illinois legislature to craft a new gun law that will impose reasonable limitations, consistent with the public safety and the Second Amendment as interpreted in this opinion, on the carrying of guns in public.
Reversed and Remanded, with Directions;
But Mandate Stayed for 180 days.