2018 IL App (1st) 162334

No. 1-16-2334

Opinion filed December 12, 2018

Third Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | No. 12 CR 4429 |
| v. | ) ) ) | Honorable Nicholas Ford, |
| DAVID KELLY, | ) ) | Judge, presiding. |
| Defendant-Appellant. | ) | |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.

Justices Howse and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a Cook County bench trial, defendant, David Kelly, was convicted of possession of a firearm while in violation of the Cannabis Control Act (720 ILCS 5/24-1.6(a)(1), (a)(e)(E) (West 2012); 720 ILCS 550/1 *et seq.* (West 2012)) and sentenced to probation. On appeal, he argues that his conviction for aggravated unlawful use of a weapon (AUUW) under sections 24-1.6(a)(1), (a)(3)(E), and 24-1.6(a)(2), (a)(3)(E) (720 ILCS 5/24-

1.6(a)(1), (a)(3)(E); (a)(2), (a)(3)(E) (West 2012)),[1] should be reversed because these provisions impermissibly criminalize the possession of a firearm for self-defense while simultaneously in possession of a misdemeanor amount of cannabis.

¶ 2                                    I. BACKGROUND

¶ 3                          A. Arrest and Procedural History

¶ 4        On February 1, 2012, defendant was arrested for possession of a firearm while in possession of a misdemeanor amount of cannabis. Subsequently, on February 23, 2012, the State charged defendant with six counts of AUUW. On March 15, 2012, defendant entered a plea of not guilty and waived a formal reading of the charges. On January 31, 2013, defendant entered a negotiated guilty plea. Under the plea agreement, defendant pled guilty to count I, which alleged a violation of section 24-1.6 (*id.* § 24-1.6(a)(2)-(3)). In exchange, the State nol-prossed the remaining counts. The court entered judgment and sentenced defendant to 18 months of mental health probation.

¶ 5        On March 19, 2013, defendant filed a motion to withdraw his guilty plea, arguing that his conviction for AUUW was facially invalid in light of *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012). On September 12, 2013, the Illinois Supreme Court held in *People v. Aguilar*, 2013 IL 112116, ¶¶ 20-22, that an AUUW offense under sections 24-1.6(a)(1), (a)(3)(E), and 24-1.6(a)(2), (a)(3)(E), was facially unconstitutional because it

---

[1]Defendant was found guilty on three counts of AUUW: count II and count VI charged a violation of section 24-1.6(a)(1), (a)(3)(E), while count III charged a violation under section 24-1.6(a)(2), (a)(3)(E). It is unclear based on the record on which count the trial court entered judgment. Therefore, we will address the constitutionality of both sections, 24-1.6(a)(1), (a)(3)(E), and 24-1.6(a)(2), (a)(3)(E).

violated the second amendment right to bear arms outside of the home. On October 21, 2013, defendant withdrew his plea, and the State nol-prossed counts I, IV, and V.

¶ 6       Defendant faced charges on three remaining counts. Count II alleged that defendant committed the offense of AUUW under section 24-1.6(a)(1), (a)(3)(E) (720 ILCS 5/24-1.6(a)(1), (a)(3)(E) (West 2012)), in that he knowingly carried in his vehicle a firearm, at a time when he was not on his own land, abode, or fixed place of business and was engaged in a misdemeanor violation of the Illinois Cannabis Control Act. Count III alleged that defendant committed the offense of AUUW under section 24-1.6(a)(2), (a)(3)(E) (*id.* § 24-1.6(a)(2), (a)(3)(E)), in that he knowingly carried or possessed on or about his person a firearm upon a public street, at a time he was not on his own land or his own abode or fixed place of business and he was not an invitee thereon for the purpose of display of such weapon or lawful commerce weapons, and he was engaged in a misdemeanor violation of the Cannabis Control Act at the time. Finally, count VI alleged that defendant committed the offense of AUUW under section 24-1.6(a)(1), (a)(3)(E) (*id.* § 24-1.6(a)(1), (a)(3)(E)), in that he knowingly carried on or about his person a firearm, at a time when he was not on his own land or in his own abode or fixed place of business, and he was engaged in a misdemeanor violation of the Cannabis Control Act.

¶ 7       On January 8, 2014, defendant moved to dismiss counts II, III, and VI arguing that the prohibition against possession of a firearm while in misdemeanor violation of the Cannabis Control Act impermissibly burdened his second amendment right to bear arms. On July 28, 2014, the trial court denied defendant's motion to dismiss. Upon ruling, the court declined application of a strict scrutiny analysis, electing instead to apply an intermediate level of scrutiny. The court commented that the legislature's decision to criminalize the use of

cannabis while in the possession of a firearm was a lawful prohibition under the second amendment.

¶ 8                                                    B. Bench Trial

¶ 9          Defendant's bench trial commenced on May 17, 2016.[2] The facts adduced at trial are as follows. On February, 1 2012, at 12:18 a.m., Sergeant Rick Nigro traveled westbound on Irving Park Road. He stopped at a red light at the intersection of Irving Park Road and Elston Street. At the red light, he heard defendant yelling from a black sport utility vehicle (SUV) to his left. Defendant yelled, "are you looking for me? I know that. Are you looking for me?" Once the light turned green, defendant drove away. Nigro followed and pulled him over.

¶ 10         Nigro approached the passenger side of the SUV and noticed that defendant was alone in the vehicle. Again defendant stated, "Are you looking for me? I know you guys are looking for me." Nigro noticed what he believed to be the butt of a handgun protruding from underneath a powder blue rag in the passenger seat. He also smelled a strong odor of cannabis in the vehicle. Upon Nigro's inquiry, defendant stated that he had a handgun on the seat and a rifle in the back of the SUV.

¶ 11         Defendant appeared to be incoherent. Nigro radioed for assistance and asked defendant if he needed help. Officer Richards and Officer Niedzielak arrived and asked defendant to exit the SUV. Defendant had trouble standing, which prompted the officers to assist him in stepping out of the vehicle. Nigro then reached into the vehicle and recovered a handgun and assault rifle. Niedzielak and Richards patted defendant down for weapons and noticed bulges

---

[2]On April 17, 2012, the trial court ordered testing of defendant's sanity and fitness to stand trial. Prior to any determination, defendant pled guilty to the AUUW charge and was sentenced to 18 months' mental health treatment. Subsequent to his withdrawal of that plea, the court again ordered sanity and fitness testing. On July 15, 2015, defendant was found unfit to stand trial. On October 22, 2015, he was found fit.

in his left shirt pocket and his sock. The officers examined the bulges and found a substance that resembled cannabis. Defendant began vomiting, and an ambulance was called. By then, Officer Kaporis had arrived on the scene. Niedzielak handed the substance to Kaporis and accompanied Richards and defendant to Swedish Covenant Hospital.

¶ 12     Officer Kaporis testified that, on the evening of the incident, he was assigned to handle traffic enforcement matters, which includes investigating driving under the influence (DUI). He responded to a call from Sergeant Nigro to investigate a possible DUI. As defendant had a medical condition and an ambulance had been called, Kaporis did not conduct any investigation at the scene. Kaporis took the substance to the police station to be examined and inventoried. He then proceeded to the hospital. However, he was not able to complete his DUI investigation.

¶ 13     On cross-examination, Officer Kaporis testified that defendant refused alternate chemical testing. Prior to his refusal, defendant performed a horizontal gaze nystagmus test, which "shows clues of impairment." Because of defendant's medical condition, no additional tests for impairment were performed.

¶ 14     After release from the hospital, defendant arrived at the police station and was booked and processed for possession of cannabis and a firearm. Defendant was also charged with DUI in violation of section 11-501(a)(6) of the Illinois Vehicle Code (625 ILCS 5/11-501(a)(6) (West 2012)) and for failure to produce a driver's license in violation of section 6-112 of the Vehicle Code (*id.* § 6-112).[3]

---

[3]In his brief, defendant states that on February 20, 2013, he was found guilty of DUI. Included in the common-law record is an order assessing fines, fees, and costs, as well as an order of supervision on the DUI charge; however, there is nothing included in the record concerning proceedings on the charge. The DUI is not a subject of this appeal.

¶ 15    Defendant testified that he used cannabis for medical reasons because of a work-related accident in 2003. Defendant fell off of a truck and landed on his head, resulting in a broken scapula and cerebral hematoma. Since the accident, he suffered from severe headaches four to five times a day, which caused nausea and fainting spells. He testified that, at his arrest, he felt ill due to his headache-induced nausea. At the time of the offense, he did not have a medical cannabis prescription but the state of Illinois has since passed medical cannabis laws and he now has a prescription.

¶ 16    After hearing closing arguments, the trial court found defendant guilty of counts II, III, and VI of the AUUW charges. Defendant was sentenced to two years' probation on one count of AUUW. See *supra* ¶ 1 n.1. Defendant's probation was terminated *instanter*. This appeal followed.

¶ 17                                   II. ANALYSIS

¶ 18    The issue on appeal is the constitutionality of the 2012 version of sections 24-1.6(a)(1), (a)(3)(E), and 24-1.6(a)(2), (a)(3)(E), which provide in relevant part:

"(a) A person commits the offense of aggravated unlawful use of a weapon when he or she knowingly:

(1) Carries on or about his or her person or in any vehicle or concealed on or about his or her person except when on his or her land or in his or her abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm; or

(2) Carries or possesses on or about his or her person, upon any public street, alley, or other public lands within the corporate limits of a city, village or

incorporated town, except when an invitee thereon or therein, for the purpose of the display of such weapon or the lawful commerce in weapons, or except when on his or her land or in his or her own abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm; and

(3) One of the following factors is present:

* * *

(E) the person possessing the weapon was engaged in a misdemeanor violation of the Cannabis Control Act [720 ILCS 550/1 *et seq.* (West 2012)], in a misdemeanor violation of the Illinois Controlled Substances Act [720 ILCS 570/100 *et seq.* (West 2012)], or in a misdemeanor violation of the Methamphetamine Control and Community Protection Act [720 ILCS 646/1 *et seq.* (West 2012)] ***.

* * *

(d) Sentence.

(1) Aggravated unlawful use of a weapon is a Class 4 felony ***." 720 ILCS 5/24-1.6 (West 2012).

¶ 19    Defendant argues that, whether his conviction for AUUW was under section 24-1.6(a)(1), (a)(3)(E), or 24-1.6(a)(2), (a)(3)(E), it should be reversed because these provisions (1) are unconstitutionally overbroad and (2) impermissibly criminalize the simultaneous possession of a handgun and a misdemeanor amount of cannabis in violation of the second amendment.

¶ 20 Both facial and as-applied challenges face the same considerable burden of overcoming the strong judicial presumption that the statute at issue is constitutional. *People ex rel. Hartrich v. 2010 Harley-Davidson*, 2018 IL 121636, ¶ 12. We are "obliged to construe all statutes so that they comport with the applicable constitutional provisions whenever reasonably possible." *Id.* Whether a statute is constitutional is a question of law, which this court reviews *de novo*. *Aguilar*, 2013 IL 112116, ¶ 15.

¶ 21                                                    A. As-Applied Challenge

¶ 22 We note at the outset that defendant neither specified at the trial level nor in his opening brief whether his constitutional challenge to the subject statutes was facial or as applied. In reply to the State's notice of the same, defendant offers that his challenge is both as applied and facial.

¶ 23 As defendant correctly notes, all as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge. " 'Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review.' " *2010 Harley-Davidson*, 2018 IL 121636, ¶ 31 (quoting *People v. Thompson*, 2015 IL 118151, ¶ 37). Our supreme court has reiterated that:

> " ' "A court is not capable of making an 'as applied' determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact. [Citation.] Without an evidentiary record, any finding that a statute is unconstitutional 'as applied' is premature." ' " *People v. Rizzo*, 2016 IL 118599, ¶ 26 (quoting *People v. Mosley*, 2015 IL 115872, ¶ 47, quoting *In re Parentage of John M.*, 212 Ill. 2d 253, 268 (2004)).

¶ 24       To the extent defendant has presented an as-applied challenge to the statutes at issue in this case, his challenge must fail for its lack of sufficiency. The record reveals that defendant did not present any particular evidence to the trial court to support an as applied challenge. In fact, the trial court, in rejecting defendant's constitutional challenge, never characterized the defendant's challenge as either as applied or facial. Nor does defendant point to any particular evidence in this court. After setting forth the principles applicable to review of an as-applied challenge, defendant plunges immediately into a strict scrutiny analysis.

¶ 25       Defendant is not relieved of his burden to overcome the strong presumption of the statutes' validity. The failure to point to anything in the record about the facts and circumstances specific to defendant's case is fatal to his as-applied claim. Thus, absent a sufficient factual basis, any determination on our part that the challenged statutes are unconstitutional as applied would be premature.

¶ 26                             B. Facial Challenge

¶ 27       A successful facial challenge faces the heavy burden of establishing that a statute is unconstitutional under any set of possible facts. *People v. Harris*, 2018 IL 121932, ¶ 38. " 'The fact that the statute might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid.' " *Rizzo*, 2016 IL 118599, ¶ 24 (quoting *Hope Clinic for Women, Ltd. v. Flores*, 2013 IL 112673, ¶ 33). If a situation exists in which the statute could be validly applied, a facial challenge must fail. *Id.*; see also *People v. Davis*, 2014 IL 115595, ¶ 25; *Hill v. Cowan*, 202 Ill. 2d 151, 157 (2002).

¶ 28               1. Overbreadth Doctrine Under the Second Amendment

¶ 29       Before proceeding further, we deem it appropriate to first dispose of defendant's argument that sections 24-1.6(a)(1), (a)(3)(E), and 24-1.6(a)(2), (a)(3)(E), are

unconstitutionally overbroad. Citing *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011), defendant first posits that second amendment rights may be analyzed comparatively to first amendment rights. He then argues that, since the nonviolent civil and/or misdemeanor offense of a small amount of cannabis, coupled with the exercise of a second amendment right of self-defense, renders one a felon the same as if the person illegally used the cannabis when possessing the firearm or if one illegally used the firearm while possessing the cannabis, it is clear the statutes are overbroad in their application.

¶ 30        Defendant misperceives the import of language utilized by the court in *Ezell*. The overbreadth doctrine is a facial challenge under the first amendment, where a law may be invalidated if a considerable number of its applications are unconstitutional in relation to the statute's plainly legitimate sweep. *United States v. Stevens*, 559 U.S. 460, 473 (2010). In *Ezell* the court, in addressing a second amendment challenge to the constitutionality of the City of Chicago's ban on firing ranges within its borders, noted that a determination as to whether the conduct, in that case the availability of firing ranges within the city limits, enjoyed constitutional protection would depend on how the right was understood when the fourteenth amendment was ratified. 651 F.3d at 702. The court noted that the Supreme Court's free-speech jurisprudence contains a parallel for this kind of threshold scope inquiry. *Id.* Nothing in the *Ezell* analysis can be read to mean that the first amendment's overbreadth doctrine applies in the context of second amendment challenges. Indeed, our supreme court, consistent with the United States Supreme Court, has not recognized the overbreadth doctrine outside the limited context of the first amendment. *People v. Garvin*, 219 Ill. 2d 104, 125 (2006); see also *People v. Greco*, 204 Ill. 2d 400, 407 (2003) (citing *In re C.E.*, 161 Ill. 2d 200, 210-11 (1994)); *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("The fact that the

Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."). Accordingly, we must decline defendant's entreaty.

¶ 31                    2. Second Amendment Right to Possess Firearms

¶ 32        Defendant argues that the provisions at issue impermissibly criminalize the simultaneous possession of a handgun and a misdemeanor amount of cannabis. The State responds that under no circumstance does the second amendment protect the right to possess a firearm while committing an offense in public, especially one that could lead to unsafe and dangerous firearm discharges.

¶ 33        The second amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II; *Heller*, 554 U.S. 570. When confronted with a claim that the right has been infringed, we turn initially to *Heller*, which laid the foundation out of which analyses of second amendment infringement claims have evolved.

¶ 34        In *Heller*, the United States Supreme Court addressed a challenge to a District of Columbia statute that banned handgun possession in the home. 554 U.S. at 573-75. The Court invalidated the statute, ruling that the prohibition on handguns in the home by law-abiding citizens and its requirement that all firearms in the home be kept inoperable violated the second amendment. *Id.* at 629-35. Significantly, the *Heller* Court noted that the second amendment is not an unlimited right. The Court expressly stated that an individual does not have "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. By way of example, the Court provided a nonexhaustive list of

"presumptively lawful regulatory measures," including "longstanding prohibitions" on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. *Id.* at 626-27 & n.26. The Court stopped short of providing an explanation of what "long-standing" and "presumptively lawful" meant. Nor did it provide the historical justifications for the announced exceptions. See *id.* Further, the Court was silent on what level of scrutiny should apply to such second amendment challenges. See *id.* at 628. The Court only stated that the District of Columbia statute would have violated the second amendment "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.*

¶ 35     Soon after, in *McDonald v. City of Chicago*, the United States Supreme Court held that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." 561 U.S. at 791. Like *Heller*, the *McDonald* Court remained silent as to what standard of scrutiny applies when there is a challenge to a regulation under the second amendment.

¶ 36     Since *Heller* and *McDonald*, courts have developed a general framework to assess challenges to a law that regulates or restricts second amendment rights. Resolution of these issues, like the one before us, involves a two-part approach. See *Wilson v. County of Cook*, 2012 IL 112026, ¶ 41. Utilizing this approach, courts first engage in a textual and historical analysis of the second amendment " 'to determine whether the challenged law imposes a burden on conduct that was understood to be within the scope of the second amendment's protection at the time of the ratification.' " *People v. Chairez*, 2018 IL 121417, ¶ 21 (quoting *Mosley*, 2015 IL 115872, ¶ 34). If the conduct falls outside of the scope of the second

amendment, then the regulated activity " 'is categorically unprotected,' " and the law is not subject to further second amendment review. *Id.* (quoting *Mosley*, 2015 IL 115872, ¶ 34). "But if the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected, then we apply the appropriate level of heightened means-end scrutiny and consider the strength of the government's justification for restricting or regulating the exercise of second amendment rights." *Id.*

¶ 37    Defendant acknowledges, with little more, the two-part approach espoused in *Wilson* and its progeny. Quoting language from *Gowder v. City of Chicago*, 923 F. Supp. 2d 1110, 1122 (N.D. Ill. 2012), as support, he returns to his oft repeated refrain, that being, misdemeanor offenses that impair one's second amendment right to bear arms are an unconstitutional burden on a protected right.

¶ 38    In *Gowder*, the applicant was convicted of a Class 4 felony for possession of a firearm at the time when the possession of a firearm was illegal in Illinois under the Safe Neighborhoods Law (Pub. Act 88-680, § 50-5 (eff. Jan. 1, 1995) (amending 720 ILCS 5/24-1)). *Gowder*, 923 F. Supp. 2d at 1113. Subsequently, in *People v. Cervantes*, 189 Ill. 2d 80 (1999), the Illinois Supreme Court determined that the Safe Neighborhoods Law was unconstitutional, which in turn mandated that a first time conviction for possession of a firearm be reduced from a felony to a misdemeanor (see *People v. Lindsey*, 324 Ill. App. 3d 193 (2001)). *Gowder*, 923 F. Supp. 2d at 1113. Seven years later, the applicant applied for a firearm permit to use in his home. *Id.* The City of Chicago denied the permit, citing section (b)(3)(iii) of the Chicago Firearm Ordinance (Chicago Municipal Code § 8-20-110(b)(3)(iii)), because he had been convicted of a nonviolent misdemeanor offense. *Gowder*, 923 F. Supp. 2d at 1113. The Northern District held that section (b)(3)(iii) of the

ordinance violated the applicant's constitutional right to keep and bear arms under the second amendment. *Id.* at 1125. The court reasoned that the city lacked evidence indicating that a nonviolent misdemeanant, like the applicant, presented a risk to society that would be analogous to a felon or a violent misdemeanant. *Id.* Therefore, in the absence of sufficient justification for restricting the defendant's right, the court determined that the ordinance was violative of the defendant's second amendment right. *Id.*

¶ 39     We note initially that this court is bound neither by federal circuit nor district court cases. *People v. Spears*, 371 Ill. App. 3d 1000, 1006 (2007). And in any case, we do not read *Gowder* as standing for the proposition that only felonious conduct may properly serve as a limitation on the exercise of one's second amendment right to bear arms. We understand *Gowder* to mean that impairment of the right requires sufficient justification, which in *Gowder*, the city failed to provide. Further, to conclude that a limitation on the right to bear arms turns simply on a distinction between felonious and misdemeanant conduct could yield protection of the right for some classifications of individuals at the risk of harm to others. Notably in *Heller*, included in the Court's nonexhaustive list of presumptively lawful measures is the prohibition on possession of firearms by, not only felons, but also by the mentally ill. None would argue that the mentally ill are either felons or misdemeanants. Thus, we believe that the better approach to determining whether the regulated conduct impermissibly infringes on the second amendment remains the two-part approach as set forth in *Wilson* and its progeny. We therefore commence our analysis there.

¶ 40                              i. The Scope of the Regulated Activity

¶ 41     The State has expressed no opinion as to whether the regulated conduct here, violation of the Cannabis Control Act, falls either within or outside the scope of the second amendment

and proceeds instead to a discussion of the applicable level of scrutiny in addressing defendant's challenge. Our supreme court has endorsed this approach. In *Chairez*, the court elected to forgo a determination of whether the regulation at issue there, the prohibition of firearms possession within 1000 feet of a public park, fell outside of the ambit of the second amendment, assuming instead that some level of scrutiny applied regardless. 2018 IL 121417, ¶ 30 (citing *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (explaining that courts should apply some level of scrutiny in cases even when the regulation identified in *Heller* is presumptively lawful)); *Woollard v. Gallagher*, 712 F.3d 865, 875 (4th Cir. 2013) (stating that a court is not "obliged to impart a definitive ruling at the first step" of its analysis but "deemed it prudent" to resolve second amendment challenges at the second step), *cert. denied*, 571 U.S. 952 (2013); see also *National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 204 (5th Cir. 2012). As in *Chairez*, we resume our analysis at step two, the level of scrutiny.

¶ 42                                    ii. The Level of Scrutiny

¶ 43        Courts have generally recognized that, although *Heller* rejected rational-basis review, some form of heighted scrutiny is required. See *Wilson*, 2012 IL 112026, ¶ 42; *Ezell*, 651 F.3d 684; *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010).

¶ 44        In his appellate brief, defendant devotes the first several pages of his argument advocating for a "strict scrutiny or near-strict scrutiny" analysis. Believing *Ezell* to be analogous, he contends that infringements on the core second amendment right of possession for self-defense must satisfy a level of scrutiny approaching strict scrutiny. See *Ezell*, 651 F.3d 684. By analogy, he maintains that Illinois's prohibition, which he characterizes as a

severe burden on the right of armed self-defense, will require that the State demonstrate an extremely strong public-interest justification and a close fit between the government's means and its end. He argues that under any strict or even intermediate scrutiny, however, individuals who commit a nonviolent misdemeanor such as possession of cannabis should not lose their second amendment rights. The State responds that the appropriate level of scrutiny is intermediate.

¶ 45        Defendant can take no solace in *Ezell*. There, the plaintiffs sought an injunction against a City of Chicago ordinance that prohibited firing ranges within the city. *Id.* at 689-90. At that time, the city had a prerequisite of firing range training before people could exercise their core constitutional right to possess guns in their own home for self defense. *Id.* at 691. In reviewing the ordinance, the court indicated that the ban was a "serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id.* at 708. The court noted that the affected plaintiffs were law-abiding citizens whose second amendment rights were entitled to be honored. *Id.* The plaintiffs' claims came close to the core of the second amendment, the ordinance curtailed the rights of all law-abiding citizens within its jurisdiction, and thus the court had to apply a rigorous showing, even if not strict scrutiny. *Id.* The facts that distinguish the case at bar from *Ezell* are readily apparent. Here, the challenged law applies only to a subset of individuals who possess firearms, not the entire population. More significantly, the challenged law in this case, possession of a firearm while in violation of the Cannabis Control Act, does not come close to being a corollary to the exercise of the right of to self-defense. Moreover, the Seventh Circuit later held that laws that come near to

the core of the second amendment right must satisfy "*a strong form of intermediate scrutiny*." (Emphasis added.) *Ezell v. City of Chicago*, 846 F.3d 888, 893 (7th Cir. 2017).

¶ 46    Similar to the challenged ordinance in *Ezell*, in *Moore*, 702 F.3d at 934-35, the law at issue forbade an individual, with the exception of law enforcement, hunters, and members of target shooting clubs, to carry a firearm ready to use in public. The *Moore* court held that the law was effectively "a flat ban on carrying ready-to-use guns outside the home" and, thus, was a sharp curtailment on the second amendment right to bear arms outside of the home, which impacted the entire law-abiding adult population in Illinois. *Id.* at 940. As such, to sustain the law, the State was required to make a strong showing of a public benefit to justify the blanket prohibition, which, in that case, it failed to do. *Id.*

¶ 47    Since the Seventh Circuit's decisions in *Ezell* and *Moore*, our supreme court has had occasion to consider the appropriate level of scrutiny applicable to second amendment challenges. In *Chairez*, the court noted that, when analyzing second amendment challenges, the argument is not strict versus intermediate scrutiny, but rather how rigorously to apply intermediate scrutiny to second amendment cases. *Chairez*, 2018 IL 121417, ¶ 35. Examining *Ezell*, the court in *Chairez* noted the Seventh Circuit's determination that the challenged law placed " 'a severe burden' " on the second amendment's right of armed self-defense and thus, the government was required to demonstrate an extremely strong public-interest justification. *Id.* (quoting *Ezell*, 651 F.3d at 708). In contrast, " 'laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified.' " *Id.* (quoting *Ezell*, 651 F.3d at 708). Thus, the *Chairez* court noted, the heightened means-end inquiry is a sliding scale that is neither fixed nor static. *Id.* (citing *Ezell*, 651 F.3d at 708). On

the one end of the scale are cases that categorically restrict the possession of firearms (*id.* ¶ 36), while on the other end of the scale are cases that place a categorical ban on the second amendment right (*id.* ¶ 39).

¶ 48    As did our supreme court in *Chairez*, we apply the analysis utilized by the Seventh Circuit in *Ezell* and *Moore* to resolve defendant's second amendment challenge here. See *id.* ¶¶ 46-49, see also *People v. Martin*, 2018 IL App (1st) 152249, ¶ 21. Accordingly, we begin with a determination of where on the sliding scale of intermediate scrutiny sections 24-1.6(a)(1), (a)(3)(E), and 24-1.6(a)(2), (a)(3)(E), should be analyzed. That determination requires us to consider the breadth of the laws and the severity of their burden on the second amendment.

¶ 49    Here, sections 24-1.6(a)(1), (a)(3)(E), and 24-1.6(a)(2), (a)(3)(E), operate only when a person is engaged in a misdemeanor violation of the Cannabis Control Act, the Illinois Controlled Substance Act, or the Methamphetamine Control and Community Protection Act outside of the home. See 720 ILCS 24-1.6(a)(1), (a)(3)(E); (a)(2), (a)(3)(E) (West 2012). Unlike the curtailment of gun rights in *Ezell* and in *Moore*, which impacted the entire law-abiding adult population, or like the total ban in *Aguilar*, the challenged law in this case applies to a specific and smaller subset of individuals. It presents neither a complete ban on the second amendment right to bear arms in public, like in *Moore* and *Aguilar*, or on conduct corollary to the second amendment right, like in *Ezell*. We believe that the breadth of the laws at issue here and their burden on the second amendment are moderate to minimal. Therefore, we find that the less rigorous form of intermediate scrutiny is appropriate and the State's public interest is more easily justified.

¶ 50       The State argues that a restriction on the possession of a firearm along with possession of a misdemeanor amount of marijuana is justified because it serves the public interest by preventing crime and protecting the public. The State asserts that gun safety in public is the primary goal of sections 24-1.6(a)(1), (a)(3)(E), and 24-1.6(a)(2), (a)(3)(E), and that the challenged provisions are designed to protect against unsafe firearm discharges.

¶ 51       Here, the State cites studies and journal articles that suggest the simultaneous possession of a firearm and cannabis use are a public safety concern.[4] The State maintains that studies have shown that cannabis use may cause paranoia or intensify preexisting paranoia, which could lead to unnecessary and unjustified or reckless shootings, placing both the firearm owner and the public in danger. The State further asserts that the use of cannabis impairs motor skill abilities, which could lead to accidental, irresponsible, or unsafe shootings, which also places the firearm owner and the public in danger.

¶ 52       We are cognizant that the State has provided studies on the behavior of individuals under the influence of cannabis as opposed to evidence of concurrent possession of firearms and cannabis. Defendant has argued that his is not a case of illegal use but one only of possession. However, it is not far-fetched to conclude that individuals who are in possession of cannabis will use cannabis. Indeed the facts of this case belie any conclusion to the

---

[4]In support of its premise, the State provides citations to numerous academic publications. See Daniel Freeman *et al.*, *How Cannabis Causes Paranoia: Using the Intravenous Administration of* Δ-*Tetrahydrocannabinol (THC) to Identify Key Cognitive Mechanism Leading to Paranoia*, 41 Schizophrenia Bulletin 391 (2015); Daniel Freeman *et al.*, *Concomitants of Paranoia in the General Population*, 41 Psychological Med. 923 (2011); Daniel Freeman & Jason Freeman, *Cannabis Really Can Cause Paranoia*, Psychology Today, https://www.psychologytoday.com/us/blog/know-your-mind/201407/cannabis-really-can-cause-paranoia (last visited Dec. 5, 2018) [https://perma.cc/LTS4-PBAR]; Claudine C. Hunalt *et al.*, *Cognitive and Psychomotor Effects in Males After Smoking a Combination of Tobacco and Cannabis Containing Up to 69 mg Delta-9-Tetrahydrocannabinol (THC)*, 204 Psychopharmacology 85 (2009); Johannes G. Ramaekers *et al.*, *High-Potency Marijuana Impairs Executive Function and Inhibitory Motor Control* 31 Neuropsychopharmacology 2296 (2004); Shikha Prashad & Francesca M. Filbey, *Cognitive Motor Deficits in Cannabis Users*, 13 Behavioral Sciences 1 (2017); *Does Marijuana Use Affect Driving?*, Nat'l Inst. on Drug Abuse, https://www.drugabuse.gov/publications/research-reports/marijuana/does-marijuana-use-affect-driving (last visited Dec. 5, 2018) [https://perma.cc/AA36-PVC6].

contrary. By his own acknowledgement and based upon our review of the record, defendant was charged and convicted of DUI. The testimony at trial was to the effect that, at the time of the traffic stop, a strong odor of cannabis emanated from defendant's vehicle and cannabis was found on his person. Defendant seemed incoherent and was not steady on his feet. His conduct in calling out to the officer can be described as nothing less than bizarre. Further, defendant testified that he used marijuana for medical reasons. Common sense tells us that the possession of a firearm in public while also in possession of cannabis is a public concern. We conclude that the State has provided sufficient information to support the conclusion that individuals who simultaneously possess a firearm and cannabis are likely to misuse firearms, thus, creating an issue of public concern.

¶ 53    Defendant urges this court to find sections 24-1.6(a)(1), (a)(3)(E), and 24-1.6(a)(2), (a)(3)(E), unconstitutional because of the societal changes in the use of cannabis. He discusses data suggesting that legalization of cannabis for medical purposes poses no danger to public health in terms of exposure to violent crimes and property crimes. First, this is not a case involving medically prescribed marijuana. Second, the impact of societal changes and acceptance of the use of marijuana in either the creation or repeal of laws in this state are matters more properly addressed to the legislature. We are constrained to apply the law as enacted.

¶ 54    "It is deeply rooted in our jurisprudence that the government inherently possesses and may lawfully exercise 'such power of restraint upon private rights as may be found to be necessary and appropriate to promote the health, comfort, safety and welfare of society and may enact prohibitions to promote the general welfare even though the prohibition invade[s] the right of liberty or property of an individual.' " *People v. Ross*, 407 Ill. App. 3d 931, 942

(2011) (quoting *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 310 (2008)). Here the legislature sought to prevent reckless discharge of firearms from individuals under the influence of cannabis or other specified illegal drugs, thereby imposing a burden on the second amendment right. The State's justifications for so doing are sufficient under intermediate scrutiny to support the modest burden on that right. That said, defendant's facial challenge fails, and we uphold the statutes as constitutional.

¶ 55                                III. CONCLUSION

¶ 56        For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 57        Affirmed.