In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2998

KEVIN W. CULP, *et al.*,

*Plaintiffs-Appellants*,

*v.*

KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:14-cv-3320 — **Sue E. Myerscough**, *Judge*.

ARGUED SEPTEMBER 20, 2018 — DECIDED APRIL 12, 2019

Before MANION, HAMILTON, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Before us is a challenge to the scheme Illinois has enacted to license the concealed carry of firearms. The plaintiffs are out-of-state residents who contend that Illinois law discriminates against them in a way that forecloses their receiving a license in violation of the Second Amendment and the Privileges and Immunities Clause of the U.S. Constitution. Two years ago we considered and rejected

the same challenge from the same parties in an appeal from the denial of their request for a preliminary injunction. The case returns on the same evidentiary record following entry of summary judgment for the State.

Illinois has regulated the public carrying of firearms by enacting the Firearm Concealed Carry Act and seeking to ensure that licenses issue only to individuals—residents and nonresidents alike—without substantial criminal and mental health histories, with the State then undertaking regular and rigorous monitoring to verify ongoing compliance. Illinois monitors the compliance of in-state license holders by accessing the robust, real-time information available about its residents. But monitoring compliance of out-of-state residents is limited in material ways by Illinois's inability to obtain complete and timely information about nonresidents—for example, about a recent arrest for domestic violence or a voluntary commitment for inpatient mental health treatment. Illinois cannot compel this information from other states, nor at this time do national databases otherwise contain the information.

The State has sought to overcome this information deficit not by holding out-of-state residents to different standards than residents for obtaining a concealed-carry license, but by issuing licenses only to nonresidents living in states with licensing standards substantially similar to those of Illinois. In this way, Illinois's "substantially similar" requirement functions as a regulatory proxy, as the State's indirect means of obtaining adequate assurances that individuals licensed to carry a firearm in public remain fit and qualified to do so.

We conclude that Illinois's substantial-similarity requirement—the centerpiece of its approach to nonresident concealed-carry licensing—respects the Second Amendment

without offending the anti-discrimination principle at the heart of Article IV's Privileges and Immunities Clause.

## I

### A

The path to (and limitations on) the concealed carrying of firearms in Illinois owes much to the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008). There the Court held that the Second Amendment confers "the right of law-abiding, responsible citizens to use arms in the defense of hearth and home." *Id.* at 635. Concluding that "the inherent right of self-defense has been central to the Second Amendment right," the Court invalidated a District of Columbia law banning handgun possession in the home, "where the need for defense of self, family, and property is most acute." *Id.* at 628.

In so holding, the Supreme Court underscored that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited," emphasizing that "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. The Court sounded the extra caution that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms"—all "presumptively lawful measures." *Id*. at 626–27 & n.26.

Two years later, the Court decided *McDonald v. City of Chicago* and held that "the Second Amendment right is fully

applicable to the States." 561 U.S. 742, 750 (2010). Echoing what it underscored in *Heller*, the Court "repeat[ed] th[e] assurances" that longstanding "prohibitions on the possession of firearms by felons and the mentally ill" remained unquestioned. *Id*. (quoting *Heller*, 554 U.S. at 626).

In the wake of *Heller* and *McDonald*, we held that the Second Amendment right to "bear arms" extends beyond the home. See *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012), *petition for rehearing en banc denied*, 708 F.3d 901 (7th Cir. 2013). This conclusion resulted in our invalidating an Illinois law that imposed a near-categorical prohibition on the carrying of guns in public. See *id.* at 934. This "sweeping ban," we reasoned, could not be upheld by the State's generalized reliance on "public safety," as Illinois had ample room to "limit the right to carry a gun to responsible persons rather than to ban public carriage altogether"—consistent with *Heller*'s recognition of the propriety of restricting gun possession by children, felons, the mentally ill, and unlawful aliens. *Id.* at 940, 942.

We ended our opinion in *Moore* with an invitation to the "Illinois legislature to craft a new gun law that will impose reasonable limitations"—in a manner "consistent with the public safety and the Second Amendment"—"on the carrying of guns in public" within the State. *Id.* at 942. Illinois responded by enacting the Firearm Concealed Carry Act, 430 ILCS 66/1 to 66/999, authorizing the issuance of concealed-carry licenses to individuals who meet prescribed eligibility requirements. This new statute set the stage for this litigation.

B

Obtaining a license under the Illinois Concealed Carry Act requires an applicant to show, among other things, that he is not a clear and present danger to himself or a threat to public safety and, within the past five years, has not been a patient in a mental hospital, convicted of a violent misdemeanor or two or more violations of driving under the influence of drugs or alcohol, or participated in a residential or court-ordered drug or alcohol treatment program. See 430 ILCS 66/10(a)(4), 66/25(3), 66/25(5); 430 ILCS 65/4, 65/8.

These standards are identical for residents and nonresidents alike, and no provision of the Illinois statute imposes any additional requirement on nonresidents. Furthermore, no aspect of this case entails a Second Amendment (or any other) challenge to any substantive-eligibility requirements in the Illinois statute. To the contrary, this case is only about how the substantial-similarity requirement applies to out-of-state residents. Resolving the question requires an examination of the statutory scheme, most especially the State's initial evaluation of applicants and its ongoing monitoring of a licensee's continued eligibility.

The issuance of a license requires the State Police to conduct an extensive background check of each applicant. See 430 ILCS 66/35. This check includes a search of multiple national databases, including the FBI's National Instant Criminal Background Check System and, for Illinois residents, of "all available state and local criminal history record information files," records pertaining to domestic violence restraining orders, and mental health files of the Illinois Department of Human Services. *Id.*

To enable the prompt identification of any disqualifying circumstances that may arise during the five-year licensing period, the Illinois statute requires ongoing monitoring. See 430 ILCS 66/70; 430 ILCS 65/8.1. The monitoring is substantial, with the State Police Firearms Services Bureau conducting a *daily* check of all resident licensees against the Illinois Criminal History Record Inquiry and Department of Human Services's mental health system for any development that might disqualify a licensee from holding a concealed-carry license. To ensure that certain intervening and disqualifying events are reported, Illinois obligates the clerks of its circuit courts as well as state law enforcement agencies to notify the State Police of certain criminal arrests, charges, and disposition information. See 430 ILCS 65/8.1(a); 20 ILCS 2630/2.1 to 2630/2.2. Illinois law also mandates that physicians, law enforcement officials, and school administrators report persons suspected of posing a clear and present danger to themselves or others within 24 hours of that determination. See 430 ILCS 65/8.1(d)(1)–(2).

This monitoring regime positions Illinois to revoke the license of an individual who poses a danger of misusing firearms. The State Police learning, for example, that a license holder had been arrested for domestic violence or committed involuntarily to inpatient mental health treatment results in a revocation of the license. See 430 ILCS 66/70(a); 430 ILCS 66/25(2) (incorporating 430 ILCS 65/4(2)(iv)), 66/25(4).

The upshot of all of this is that eligibility for a concealed-carry license in Illinois turns on the continuing and verifiable absence of a substantial criminal record and mental health history for all applicants, regardless of residency. See 430 ILCS 66/25(2) (incorporating 430 ILCS 65/4(2)(ii)–(xvii)),

66/25(3). While this observation is simple, implementing it is not. The State's ability to determine eligibility depends on access to information. And it is on this point that Illinois faces a substantial practical barrier—an information shortfall—when it comes to the mental health and criminal histories of out-of-state residents wishing to obtain a license.

Illinois does not have access to other states' criminal history databases or mental health repositories. Nor are other states required to provide this information to Illinois or, more generally, to include the information in a national database to which the Illinois State Police have access. This is today's information reality, and it is uncontested. At no point in this litigation—not in the district court, during the first appeal, or now in this second appeal—have the plaintiffs presented evidence refuting Illinois's showing of this information deficit.

Despite this information gap, the Illinois legislature still authorized concealed carry by out-of-state residents in circumstances where the State can obtain enough confidence about an applicant's background and continued fitness to carry a firearm in public. The confidence comes, the legislature determined, from a regulatory proxy—an indirect indicator that provides adequate assurance that a nonresident is fit and qualified to engage in concealed carry in Illinois. The proxy took the form of the legislature authorizing the issuance of concealed-carry licenses to residents of states "with laws related to firearm ownership, possession, and carrying, that are substantially similar to the requirements to obtain" an Illinois concealed-carry license. 430 ILCS 66/40(b).

The law of another state is deemed "substantially similar" if the state, like Illinois, (1) regulates who may carry firearms in public; (2) prohibits those with involuntary mental health

admissions, and those with voluntary admissions within the past five years, from carrying firearms in public; (3) reports denied persons to the FBI's National Instant Criminal Background System; and (4) participates in reporting persons authorized to carry firearms in public through the National Law Enforcement Telecommunications System. See 20 Ill. Admin. Code § 1231.10.

The rationale is plain: because states that meet these criteria monitor the same criminal and mental health qualifications Illinois requires under its own law and report this information to national databases, Illinois can access the information to assess whether nonresidents from these states are qualified to carry a concealed gun in Illinois. And, even more critically, the criminal history and mental health reporting practices of these substantially similar states enable Illinois to learn about any disqualifying event that warrants revoking an individual's license.

The State Police implement this monitoring of nonresident licensees by running a check of national databases every 90-days. By doing so, Illinois positions itself to learn of new arrests, convictions, and mental health commitments and thus ongoing fitness for concealed carry within the State.

To determine which states have substantially similar regulatory schemes, Illinois undertakes a survey process. The State Police send a survey to all other states seeking information regarding their regulation of firearm possession and related criminal history and mental health reporting. Since 2013, Illinois has conducted two surveys and most recently, in 2015, determined that four states meet the criteria: Arkansas, Mississippi, Texas, and Virginia. Residents of these states, therefore, may apply for an Illinois concealed-carry license.

Illinois has approached the survey process with a measure of diligence. The surveys sought detailed information from other states, and Illinois officials took steps to follow up with states that failed to respond or provided incomplete information. Illinois also changed prior substantial-similarity determinations in response to receiving new information.

Individuals living outside a substantially similar state are not without firearm privileges in Illinois. To the contrary, the Concealed Carry Act affords all out-of-state residents holding a concealed-carry permit in their home state the right to travel with a firearm in their vehicle while driving in Illinois. See 430 ILCS 66/40(e). And the Illinois Firearm Owners Identification Card Act, 430 ILCS 65/0.01 to 65/16-3, allows out-of-state residents who are authorized to possess a firearm in their home state to do the same in Illinois while on their own premises or in the home of an Illinois resident with permission, see 430 ILCS 65/2(b)(10), while hunting, see 430 ILCS 65/2(b)(5), and while engaging in target practice at a firing or shooting range, see 430 ILCS 65/2(b)(7). Nonresidents may also possess a firearm that is unloaded and enclosed in a case. See 430 ILCS 65/2(b)(9).

C

In 2014 nine individuals who live outside of Illinois, but not in one of the four substantially similar states, brought suit alleging that Illinois's regulation of out-of-state concealed-carry licensing violates the Second Amendment, the Privileges and Immunities Clause of Article IV, and the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment. The individual plaintiffs are responsible, law-abiding individuals who travel to Illinois for

business or family reasons and, in the interest of personal safety, wish to obtain a concealed-carry license.

Beyond broadly asking the district court to declare the statute's substantial-similarity requirement unconstitutional, the plaintiffs sought a preliminary injunction. Illinois opposed the motion by submitting an affidavit from the Chief of the Firearms Services Bureau, Jessica Trame, outlining the State's interest in not only carefully vetting applicants for concealed-carry licenses, but also monitoring the ongoing fitness and qualifications of all licensees. Chief Trame relayed substantial detail regarding the challenges Illinois faces obtaining information about out-of-state applicants' criminal and mental health histories at the application stage, due largely to the absence of certain information in national databases and the State's lack of resources to perform a complete record search of applicants from other states.

Chief Trame further explained that Illinois faces even greater difficulties when it comes to obtaining updated information pertinent to monitoring the ongoing qualifications of nonresidents. Illinois, for example, does not have access to other states' mental health information and, as a result, relies on federal databases to obtain as much information as possible. On this point, Chief Trame was specific: "Out-of-state mental health facilities are not required by their states to report admissions or persons presenting a clear and present danger to [the Illinois Department of Human Services] or to [the Illinois State Police], and do not do so unless [the Illinois State Police] makes a request for that information." "Many out-of-state mental health entities," she added, "do not provide this information even after an [Illinois State Police] request."

After considering the State's showing of these information deficits—all of which went uncontested by the plaintiffs—the district court denied the request for a preliminary injunction. The district judge emphasized that the State has an important and strong interest in protecting the public by ensuring that unqualified individuals are not licensed to carry loaded fire-arms on Illinois streets. *Culp v. Madigan*, No. 14-CV-3320, 2015 WL 13037427, at *16 (C.D. Ill. Dec. 7, 2015).

We affirmed. *Culp v. Madigan*, 840 F.3d 400, 403 (7th Cir. 2016). Pointing to our decision in *Moore*, we reiterated that Illinois "must permit law-abiding and mentally healthy persons to carry loaded weapons in public." *Id.* at 401. We then concluded that because Illinois lacks access to information about the qualifications of out-of-state residents—in particular, whether nonresidents are law-abiding and mentally healthy—the State's substantial-similarity requirement was consistent with *Moore*'s mandate and did not offend the Second Amendment. See *id.* at 402.

Our prior opinion, to be sure, recognized that the Illinois statute undeniably precludes some law-abiding nonresidents—those living outside a state with substantially similar laws—from receiving a concealed-carry license. See *id*. Against the weight of the State's public-safety interests, however, we concluded that the Second Amendment permitted Illinois's regulatory approach, at least on the record before the district court at the preliminary injunction stage. See *id.* at 402–03.

On remand the parties cross-moved for summary judgment on a nearly identical factual record. (The only change was that Illinois submitted a revised affidavit from Chief Trame to list those states presently deemed substantially

similar.) Adhering closely to our decision in *Culp I*, the district court entered summary judgment for the State, emphasizing that Illinois "has a substantial interest in restricting concealed carry licenses to those persons whose qualifications can be verified and monitored" and "[t]he restriction barring nonresidents from states without substantially similar laws from applying for an Illinois concealed carry license is substantially related to that strong public interest." *Culp v. Madigan*, 270 F. Supp. 3d 1038, 1058 (C.D. Ill. 2017). The court also denied the plaintiffs' other constitutional claims. See *id.* at 1058–59.

## II

This second appeal mirrors the first in all respects. The facts have not changed, and the legal issue is the exact same. The plaintiffs nonetheless urge us to overturn our decision in *Culp I*. While we decline to do so, it is appropriate to expand upon our reasoning.

### A

The plaintiffs remain clear that they are not challenging any criminal history or mental health limitations Illinois has imposed on concealed-carry. Indeed, at least for purposes of this case, the plaintiffs advance no claim that any licensing-eligibility standard falls outside *Heller's* recognition of "longstanding prohibitions on the possession of firearms by felons and the mentally ill" that the Supreme Court has identified as "presumptively lawful." 554 U.S. at 626–27 & n.26.

What the plaintiffs instead challenge is how the Concealed Carry Act impacts out-of-state residents. They argue that the Second Amendment confers a fundamental right to carry a firearm in public for self-defense and that principles of strict scrutiny preclude the State from limiting that right to the

degree Illinois has done here—to foreclose the law-abiding residents of 45 states from acquiring a license.

This contention is overbroad, for it cannot be squared with the Supreme Court's emphasis in *Heller* that the rights conferred by the Second Amendment are not unlimited. See *id*. at 595. The right to bear arms, as a historical matter, "was not a right keep and carry any weapon whatsoever and for whatever purpose." *Id*. at 626. And most to the point here, the Court underscored the propriety of the "longstanding prohibitions on the possession of firearms by felons and the mentally ill," while also observing that most courts throughout the 19th century "held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Id.*

The plaintiffs accept this historical reality or, at the very least, fail to offer a competing historical account. And the absence of historical support for a broad, unfettered right to carry a gun in public brings with it a legal consequence: the Second Amendment allows Illinois, in the name of important and substantial public-safety interests, to restrict the public carrying of firearms by those most likely to misuse them. See *United States v. Skoien*, 614 F.3d 638, 645 (7th Cir. 2010) (*en banc*). The State has done so here on two dimensions—criminal and mental health history—expressly recognized in *Heller* and unchallenged (either generally or specifically) by the plaintiffs. Perhaps as they must, the plaintiffs expressly admit that they "do not take issue with [firearm] restrictions on individuals with certain criminal histories or a history of admittance to mental health facilities."

Nor does the plaintiffs' position improve if we turn to our decision in *Moore*. While the plaintiffs are right to observe that

we held that an individual's Second Amendment right to possess a firearm for self-defense extends outside the home, our opinion in *Moore* did not end there. We went the added step of reiterating the assurances from *Heller* and *McDonald* that the rights conferred by the Second Amendment are not unlimited and, even more specifically, that a state's interest in promoting public safety is strong enough to sustain prohibitions on the possession of firearms by felons and the mentally ill. See *Moore*, 702 F.3d at 940 ("And empirical evidence of a public safety concern can be dispensed with altogether when the ban is limited to obviously dangerous persons such as felons and the mentally ill.").

*Moore*, therefore, cannot bear the weight the plaintiffs place on it. We concluded that the individual right to bear arms recognized in *Heller* and *McDonald* extended, at least to some degree, to the public carrying of firearms. See *id*. But neither *Moore* nor the Supreme Court's decisions in *Heller* and *McDonald* preclude a state from imposing criminal history and mental fitness limitations on gun possession. See *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786.

B

This brings us to the plaintiffs' contention that the State's substantial-similarity requirement impermissibly discriminates against out-of-state residents by denying them the right to carry a handgun in the same manner available to residents. This is the essence of the plaintiffs' challenge to the Illinois Concealed Carry Act. Put most simply, the plaintiffs frame this as a discrimination case.

It remains undisputed, however, that Illinois's licensing standards are identical for all applicants—residents and

nonresidents the same. What is more, the plaintiffs do not challenge Illinois's showing that the differential licensing impact is the product of the information deficit the State faces with vetting and monitoring out-of-state residents. For its part, moreover, Illinois has demonstrated that the substantial-similarity requirement relates directly to the State's important interest in promoting public safety by ensuring the ongoing eligibility of who carries a firearm in public. Intermediate scrutiny requires no more. See *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (explaining that the tailoring prong of intermediate scrutiny requires that any regulation of firearms must be substantially related to an important government interest); see also *Skoien*, 614 F.3d at 642 (articulating the same standard).

Before us is a State with a weighty interest in preventing the public carrying of firearms by individuals with mental illness and felony criminal records. Illinois established a licensing and monitoring scheme to achieve this public-safety objective, yet the unrefuted evidence shows that information deficits inhibit the State's ability to monitor the ongoing qualifications of out-of-state residents outside of the substantially similar states. Forcing the State to issue concealed-carry licenses to nonresidents despite this information shortfall would thrust upon Illinois a race to the bottom. Licenses would have to issue along eligibility standards incapable of being verified or, at the very least, below those established by the State legislature for its own residents. Once eligible would risk meaning forever eligible. That outcome is hard to reconcile with *Heller*'s acceptance of the "longstanding prohibitions on the possession of firearms by felons and the mentally ill." 554 U.S. at 626–27 & n.26. And the outcome has even less to say for itself where, as here, the plaintiffs accept the substance

of the criminal history and mental health limitations Illinois has imposed on concealed-carry licensing.

The plaintiffs insist that the Second Amendment requires Illinois to let them *apply* for a concealed-carry license. While the observation may be right, it only goes so far. It may be possible for Illinois to take additional steps in vetting initial applications. The State could modify its present practices by, for example, requiring a sworn declaration on a nonresident's mental health from a treating physician or shifting more of the cost of obtaining out-of-state criminal history information to the nonresident applicant.

But focusing on the initial application responds to only part of the State's interest in enforcing the requirements to carry a concealed firearm in Illinois. The State's enforcement authority necessarily must bring with it a practical way of monitoring the ongoing fitness of individuals licensed to carry a firearm on a public street. See *Berron v. Illinois Concealed Carry Licensing Review Board*, 825 F.3d 843, 847 (7th Cir. 2016) ("Illinois is entitled to check an applicant's record of convictions, and any concerns about his mental health, close to the date the applicant proposes to go armed on the streets."). As we put the point in *Culp I*, "[t]he critical problem presented by the plaintiffs' demand—for which they offer no solution—is verification." 840 F.3d at 403.

Monitoring depends on staying informed, on learning of developments that may affect public safety within the State. Take, for instance, a nonresident licensee arrested for domestic battery or who suffers from acute mental illness and, after much persuasion from family and friends, agrees to inpatient treatment. Either development renders the individual ineligible to carry a firearm in Illinois. See 430 ILCS 66/70(a); 430

ILCS 66/25(2) (incorporating 430 ILCS 65/4(2)(iv)), 66/25(4). The State cannot revoke a license without first learning of the development, however. And it is this dual reality—the union of this information deficit and public-safety considerations—that led the Illinois legislature to condition nonresident concealed-carry licensing on an individual living in a state with substantially similar laws.

Yes, "the plaintiffs do make some apt criticisms of Illinois law," *Culp I*, 840 F.3d at 403; yes, the statutory scheme operates to prevent many law-abiding nonresidents from publicly carrying a firearm within Illinois; and yes, by focusing on another state's regulatory scheme, it allows nonresident licensing to turn on a factor beyond any individual's personal control.

While Illinois does not dispute these elements of imperfection, the plaintiffs, for their part, do not dispute the State's monitoring challenges. To the contrary, the plaintiffs accept that Illinois cannot adequately monitor their mental health or potential criminal behavior. And all the plaintiffs say in response is that it is enough on the monitoring front for Illinois to ask license holders to self-report any disqualifying criminal history or mental health developments. The Second Amendment does not mandate this approach: Illinois is not forced to accept the public-safety risk of relying on individuals to self-report a felony conviction, domestic violence arrest, or mental health crisis. Nor is the State required to tailor its law so narrowly as to sacrifice its important monitoring interest.

In the end, the analysis resolves in Illinois's favor and sustains the State's substantial-similarity requirement. Any other conclusion—compelling the State to issue concealed-carry

licenses without then being able to monitor ongoing eligibility—would force Illinois to accept an idiom: what the State does not know cannot hurt it. The State's interest in maintaining public safety is too substantial to mandate that result. On the record before us, then, and giving effect to the permissible criminal history and mental health limitations underscored in *Heller*, we hold that the substantial-similarity requirement of the Illinois Concealed Carry Act respects the Second Amendment.

Our holding responds to the plaintiffs' request for a declaration that the Illinois statute's substantial-similarity requirement is unconstitutional root and branch—as applied to themselves and all law-abiding residents living in 45 states. We have declined the invitation owing in large measure to the expanse of the information deficit that precludes the State from monitoring ongoing fitness. To restate the holding, though, is to recognize a limitation: Illinois's evidentiary showing went uncontested at every stage of this case. The plaintiffs as a group never challenged the State's showing of an information deficit, nor did any individual plaintiff seek to overcome it by showing such a substantial and regular presence in Illinois to enable the monitoring essential to the State's public-safety interest. So we leave for another day what the Second Amendment may require in a circumstance where the information deficit is no longer present.

## III

The plaintiffs also argue that Illinois's concealed-carry regulatory scheme offends the Privileges and Immunities Clause of Article IV. Here, too, we disagree.

The Supreme Court has clarified that states must accord residents and nonresidents equal treatment "[o]nly with respect to those 'privileges' and 'immunities' bearing on the vitality of the Nation as a single entity." *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 279 (1985) (quoting *Baldwin v. Fish and Game Comm'n of Montana*, 436 U.S. 371, 383 (1978)). If a challenged regulation deprives nonresidents of a protected privilege, the question becomes whether the state has offered a substantial reason to justify the discriminatory impact and, relatedly, whether its regulatory approach bears a substantial relationship to its objective. See *Barnard v. Thorstenn*, 489 U.S. 546, 552–53 (1989). This inquiry recognizes that "the states should have considerable leeway in analyzing local evils and in prescribing appropriate cures," for only unjustifiable discrimination violates the Privileges and Immunities Clause. *United Bldg. and Constr. Trades Council of Camden County and Vicinity v. Mayor and Council of the City of Camden*, 465 U.S. 208, 222–23 (1984) (quoting *Toomer v. Witsell*, 334 U.S. 385, 396 (1948)).

The Supreme Court also has recognized that "the Privileges and Immunities Clause was intended to create a national economic union." *Piper*, 470 U.S. at 279–80. This principle aligns with the Court's primary precedents in this area, which have typically involved economic rights. See, *e.g., Hicklin v. Orbeck*, 437 U.S. 518, 526 (1978) (invalidating Alaska's requirement that residents be hired over nonresidents for particular oil and gas jobs); *Toomer*, 334 U.S. at 396 (invalidating a statute that charged nonresident fishermen a fee one hundred times greater than a similar fee charged to resident fishermen); *Ward v. Maryland*, 79 U.S. 418, 432 (1870) (invalidating a statute that imposed licensing and

fee requirements on nonresident merchants that were not similarly imposed on resident merchants).

No plaintiffs here contend that carrying a concealed weapon is essential to their ability to work in Illinois. While the Court has never held that the Privileges and Immunities Clause is limited to economic interests, we are equally unaware of a decision holding that a privilege of citizenship includes a right to engage in the public carry of a firearm, or, even more specifically, the right to carry a concealed firearm in another state. Under the law as it presently stands, it seems difficult to conclude that such a right, if it exists, is essential to the ongoing vitality of the nation. See *Piper*, 470 U.S. at 279.

But we stop short of taking a position on the fundamental right question. The plaintiffs' claim fails for another reason: the Privileges and Immunities Clause does not compel Illinois to afford nonresidents firearm privileges on terms more favorable than afforded to its own citizens. Yet that is the precise import of the plaintiffs' challenge to Illinois's Concealed Carry Act. They demand the right to carry a concealed firearm despite the (uncontested) information barrier Illinois faces when monitoring their continued fitness and eligibility. The State does not face this monitoring barrier with its own citizens, however.

Illinois's adoption of a substantial-similarity requirement to bridge the information deficit places nonresidents on equal regulatory footing with Illinois residents and does not offend the Privileges and Immunities Clause. To the extent the impact of this regulation works to disadvantage nonresidents, such an effect is not the type of unjustifiable discrimination prohibited by the Clause. See *Bach v. Pataki*, 408 F.3d 75, 91, 94 (2d Cir. 2005) (holding that a New York regulation restricting

applications for handgun licenses to nonresidents with a primary place of business in the State did not violate the Privileges and Immunities Clause because the "discrimination [was] sufficiently justified by New York's public safety interest in monitoring handgun licensees" and its inability to access sufficient information about the qualifications of nonresidents), overruled on other grounds by *McDonald v. Chicago*, 561 U.S. 742, 791 (2010). Put another way, the Privileges and Immunities Clause, no more than the Second Amendment, does not force Illinois into a regulatory race to the bottom.

## IV

What remains are the plaintiffs' claims that the substantial-similarity requirement violates the guarantees of equal protection and due process found in the Fourteenth Amendment. The plaintiffs, however, have not identified any precedent (from the Supreme Court or otherwise) recognizing that either the Equal Protection or Due Process Clause confers a substantive right to engage in the public carry of a firearm, or specifically, the concealed carry of a firearm in another state. Nor have we.

Furthermore, repackaging a claim that is more appropriately brought under a different constitutional provision—here the Second Amendment—as an equal protection claim will not usurp the settled legal framework that has traditionally applied. See *Bogart v. Vermilion County, Ill.*, 909 F.3d 210, 214–15 (7th Cir. 2018) (endorsing the same reasoning in the context of parallel First Amendment and equal protection claims); see also *Muscarello v. Ogle County Bd. Of Comm'rs*, 610 F.3d 416, 422–23 (7th Cir. 2010) (endorsing the same reasoning in the context of parallel takings and equal

protection claims). Regardless, even if we were to consider this claim independent of the plaintiffs' Second Amendment claim, the relevant question under the Equal Protection Clause is whether the Illinois Concealed Carry Act impermissibly discriminates against a suspect class or deprives out-of-state residents of a fundamental right. The answer here is no for all the reasons in our analysis of the plaintiffs' Second Amendment challenge to the Illinois statute.

We conclude with the plaintiffs' due process claim. There has been no Second Amendment or Privileges and Immunities Clause violation, and therefore, without any authority for their proposition that the Due Process Clause independently confers a right to carry a concealed firearm in Illinois, the plaintiffs cannot show that they have been deprived of a liberty interest without due process. See *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

*        *        *

What makes a case like this difficult is that it pits the Second Amendment against equally important principles of federalism. The Illinois Concealed Carry Act survives the present challenge in large measure because of the undisputed empirical showing that the State today is without a reliable means of monitoring or otherwise learning of intervening, material adverse developments with the criminal history and mental health of nonresidents. The Second Amendment allows Illinois to account for this limitation in determining the terms on which to award concealed-carry licenses to out-of-state residents.

But time does not stand still. Nor can Illinois as other states become willing to make more information available. The information deficit that today allows and sustains Illinois's substantial-similarity requirement may close and position the State to adjust its licensing scheme. In regulating the public carrying of firearms, Illinois, then, must in good faith continue to evaluate whether to amend its approach. In these ways, our federal structure reacts and evolves to respect local interests and individual rights.

For these reasons, we AFFIRM.

MANION, *Circuit Judge*, dissenting. In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2010), the Supreme Court held our Constitution ensures "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Shortly thereafter, this court logically extended the Supreme Court's holding to include "a right to carry a loaded gun outside the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012).

Nevertheless, the court today upholds Illinois's scheme that categorically prohibits the citizens of 45 states from fully exercising this right when they find themselves within Illinois's borders. Because Illinois has failed to adequately justify this significant curtailment of individual liberty, I dissent.[1]

## I.

In the wake of our decision in *Moore*, Illinois passed the Firearm Concealed Carry Act (FCCA), allowing those whom Illinois licenses to carry concealed firearms in public for self-defense. As the court notes, Illinois allows nonresidents without an Illinois license to bring firearms into the state in very limited circumstances. For instance, nonresidents with a concealed-carry license from their own state may "travel with a firearm in their vehicle," and anyone entitled to possess a firearm in their own state may "possess a firearm … on their own premises or in the home of an Illinois resident with permission, while hunting, and while engaging in target practice at a firing or shooting range." Maj. Op. at 9 (citations omitted). But licensed concealed carry remains the only legal way to bear a firearm in public in Illinois, *see* 720 ILCS 5/24-1.6(a)

---

[1] Because I conclude the plaintiffs should succeed on their Second Amendment claim, I do not address their claims brought under other provisions of the Constitution.

(defining the crime of "Aggravated unlawful use of a weapon" to include the open carry of a firearm), and Illinois unconditionally denies that ability to the residents of 45 states.

It does so by only accepting applications for concealed-carry licenses from nonresidents who reside in states it determines have "laws related to firearm ownership, possession, and carrying, that are substantially similar to the requirements to obtain a license under [the FCCA]." 430 ILCS 66/40(b). The Illinois Department of Police decides which states are "substantially similar." *See id.*; ILL. ADMIN. CODE tit. 20 § 1231.110(c). To determine which states qualified, the Department sent surveys to the states in 2013. Based on the responses, the Department concluded Hawaii, New Mexico, South Carolina, and Virginia were "substantially similar." In 2015, the Department sent another round of surveys. Hawaii, New Mexico, and South Carolina changed their answers, so the Department took them off the list. But the Department added Arkansas, Mississippi, and Texas. That is the last survey of which we have evidence.[2]

Therefore, as it stands, only the residents of Arkansas, Mississippi, Texas, and Virginia may even apply for a nonresident concealed-carry license. This means Illinois categorically denies the residents of the remaining 45 states the ability to exercise the fundamental right to carry a firearm in public in Illinois simply because of the "ineligible" state in which they reside. Such a regime cannot withstand dutiful judicial scrutiny.

---

[2] At oral argument, counsel for Illinois said the State was "constantly sending out surveys," but there is no evidence of any survey after 2015.

**II.**

As I explained in my dissent the last time this case was before this court, there is no doubt the FCCA must face "exacting (although not quite strict) scrutiny." *Culp v. Madigan*, 840 F.3d 400, 407 (7th Cir. 2016) (Manion, J., dissenting). Illinois must show "an extremely strong public-interest justification and a close fit between the government's means and its end." *Id.* at 404 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011)). I concluded Illinois did not do so at the preliminary injunction stage, and nothing has changed since then.

Illinois's proffered goal for its law—to keep guns out of the hands of felons and the mentally ill in public—assumedly satisfies the "extremely strong public-interest justification" prong of the test.[3] The question is whether Illinois's licensing scheme that prevents law-abiding, healthy citizens from *even applying* for a concealed license is sufficiently tailored to that goal. Certainly, if Illinois is going to have a licensing regime, it has to have some method of ensuring the individuals it licenses are eligible and remain so. However, Illinois has utterly failed to show that banning the residents of an

---

[3] However, as some recent cases indicate, *see generally Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019); *Binderup v. Att'y Gen. U.S.*, 836 F.3d 336 (3d Cir. 2016) (en banc), questions about whom a state may dispossess of gun rights are likely to be an issue in the future. Under some interpretations, Illinois's regime, which disqualifies based on a conviction for any felony, 430 ILCS 65/8(c), might go too far, *see generally Kanter*, 919 F.3d at 469 (Barrett, J., dissenting) ("Absent evidence that Kanter would pose a risk to the public safety if he possessed a gun, the governments cannot permanently deprive him of his right to keep and bear arms.").

overwhelming majority of the country from even applying for a license is a "close fit" to its goal.

Most importantly, and as I pointed out before, the system is grossly underinclusive and overinclusive. An Illinois resident holding a license could cross the Mississippi River to Missouri, check himself into a mental-health clinic, and then return without Illinois ever knowing. Or a person could live in one or more of the 45 dissimilar states for years and then move to a similar state, automatically becoming eligible to apply for a license even though "Illinois (and, presumably, the substantially similar state as well) [would be] unable to obtain information about his possible criminal or mental problems in those states." *Culp*, 840 F.3d at 403 (majority opinion). But a colonel in the United States Air Force licensed as a concealed-carry instructor in Illinois cannot apply for a concealed-carry license of his own because he is a resident of Pennsylvania. Courts should not allow such slipshod laws to proscribe the exercise of enumerated rights. *See id.* at 408 (Manion, J., dissenting) (citing *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 232 (1987)).

Illinois asks the court to ignore these problems because of presumed administrative difficulties. If it is not allowed to restrict the application process to residents of certain states, it contends, it will have no way of concluding the residents of *dissimilar* states are eligible for a license and continue to be so for the term of the license. Illinois's main objection to allowing applications from anyone is that if an applicant's state does not report certain information to national databases, Illinois would have to obtain the information some other way, and that would be too burdensome.

To start with, "the Constitution recognizes higher values than speed and efficiency"; simply avoiding cost and administrative burden does not justify denying constitutional rights. *Stanley v. Illinois*, 405 U.S. 645, 656 (1972); *see also Watson v. City of Memphis*, 373 U.S. 526, 537 (1963) ("[I]t is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them."); *Culp*, 840 F.3d at 407 ("[T]he tailoring requirement prevents [the] government from striking the wrong balance between efficiency and the exercise of an enumerated constitutional right.").

Furthermore, there is no evidence in the record that Illinois could not pursue its goal in a more targeted way that would respect the fundamental right at stake. Perhaps Illinois could pass the costs on to the applicant—it already charges nonresidents twice as much when they apply. *See* 430 ILCS 66/60 (imposing $150 fee for residents and $300 fee for nonresidents). Or Illinois could place the burden on applicants themselves to contact appropriate authorities and acquire the information Illinois demands, and it could require the information be transmitted in some form with sufficient indicia of authenticity.

Similar workarounds could be found for mental-health records, even though some states do not track mental-health information. Illinois already requires every applicant for a concealed-carry license to provide Illinois with the ability to access the applicant's private information. *See* 430 ILCS 66/30(b)(3) (listing among the contents of an application "a waiver of the applicant's privacy and confidentiality rights and privileges under all federal and state laws, including those limiting access to…psychiatric records or records

relating to any institutionalization of the applicant"). So, to the extent any mental-health records are kept by the authorities, Illinois could access them (or, again, put the cost and time burden on the applicant to access them and provide certified versions to Illinois). In the case of voluntary mental-health admissions that are particularly likely not to be tracked, Illinois could have every applicant from a dissimilar state conform to the certification procedure already found in Illinois law, which allows those who have been voluntarily treated in the past to obtain a certification of health from "a physician, clinical psychologist, or qualified examiner." *See* 430 ILCS 65/8(u). Indeed, "such certification would provide Illinois with more information than it can obtain about its own residents' out-of-state sojourns, which they admittedly cannot track." *Culp*, 840 F.3d at 409.

To its credit, the court today acknowledges there are reasonable alternatives to an outright ban when it comes to the initial application. *See* Maj. Op. at 16. Nonetheless, the court finds the issue with continued monitoring insurmountable. It says there is an "information deficit" about the ongoing eligibility of licensees that Illinois cannot overcome for any but those who reside in similarly situated states. But this deficit is not as severe as Illinois would have the court believe.

It is true Illinois maintains an extensive monitoring system to keep tabs on its own residents, including their voluntary mental-health treatments. Illinois says that because it cannot keep the same watchful eye on nonresidents, it must depend on those licensees' states to keep substantially similar eyes on them. In practice, this amounts to Illinois relying on national databases it checks quarterly to make sure its nonresident licensees have no disqualifying issues. Several facts

demonstrate that this system is not a "close fit" to Illinois's goal of ensuring an ineligible person is not allowed to keep his license.

To begin with, Illinois's failure to send out a new survey since 2015 significantly undermines its argument that its system is tailored to its goal. In 2013, Illinois decided Hawaii, New Mexico, and South Carolina were "sufficiently similar." But between 2013 and 2015, the laws in those states changed to the point Illinois felt it could no longer trust them. This evidences that laws and practices can materially change in a short amount of time. Nevertheless, Illinois has been content to let Arkansas, Mississippi, Texas, and Virginia remain undisturbed as "substantially similar" states since 2015, without even a check-up survey. Illinois's failure to ensure the states it trusts are still reliable weakens its assertion that depending on those states is critical to protecting its citizens.

Furthermore, relying on other states hardly provides the kind of systematic, up-to-date monitoring Illinois claims it needs. For one thing, two of the "substantially similar" states appear to rely on self-reporting of mental-health issues. Virginia, while it does track voluntary mental-health admissions, does so only by self-reporting. *See* Va. Response to Ill. Survey, App. 293 ("There is no systematic way of checking voluntary admissions in Virginia other than self reporting."). Arkansas indicated it relied on self-reporting as well. *See* Ark. Response to Ill. Survey, App. 147.[4] Yet these two states have systems upon which Illinois is willing to rely.

---

[4] In Arkansas's response to Illinois's survey, it said it requires an applicant for a license to "provide information concerning their mental health status at the time of application" but there is no "check or

More generally, amicus Everytown for Gun Safety warns the court of the dangers of relying on "national databases to perform background checks…and to monitor permit holders' continued law-abiding status." Br. of Everytown for Gun Safety at 14. Amicus tells us it can take "over a year" for a felony conviction in Mississippi, a "substantially similar state," to find its way onto a national database. *Id.* at 17. Concerning mental-health reporting, amicus lists Arkansas among states that report mental-health records "at a per-capita rate that is aberrantly low compared to other states." *Id.* at 19–20 & n.29. Similar to the failure to send out new surveys, these reported deficiencies undercut Illinois's "close fit" argument.

As a final point, the "information deficit" could be worked around just like problems with the initial application. Instead of relying on these (potentially flawed) databases, Illinois could have nonresident licensees from substantially *dissimilar* states submit verified, quarterly updates on their statuses, including quarterly mental-health certifications.[5] In addition to allowing "law-abiding, responsible" citizens from every state in the Union to seek a license, this approach would have the

---

validation of the information provided by the applicant." Ark. Response to Ill. Survey, App. 147.

[5] In suggesting Illinois could impose quarterly reporting and mental-health-certification requirements, I do not mean to suggest those would independently pass constitutional muster. But it is enough for the purposes of *this case* to conclude there are significantly less restrictive means of achieving Illinois's goal apart from an outright ban. *See Moore*, 702 F.3d at 942 ("[W]e need not speculate on the limits that Illinois may in the interest of public safety constitutionally impose on the carrying of guns in public; it is enough that the limits it *has* imposed go too far.").

added benefit of ensuring timely and accurate information the national databases cannot guarantee.

### III.

Illinois's scheme categorically prevents the law-abiding citizens from a vast majority of the country from even applying for the ability to exercise their constitutional right to bear arms in public for self-defense in Illinois. That crosses a constitutional line, and Illinois must do more than show its system "broadly serves the public good." *See Binderup v. Att'y Gen. U.S.*, 836 F.3d 336, 380 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments). It has not done so. I respectfully dissent.